Filed 5/30/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MITCHELL SIMS et al.,<br><br>      Plaintiffs and Respondents,<br><br>v.<br><br>DEPARTMENT OF CORRECTIONS<br>AND REHABILITATION et al.,<br><br>      Defendants and Appellants. | A135290<br><br>(Marin County<br>Super. Ct. No. CIV 1004019) |

The question presented by this appeal is whether regulations promulgated by the California Department of Corrections and Rehabilitation (CDCR or agency) regarding the manner in which the death penalty is carried out substantially comply with the California Administrative Procedure Act (APA) (Gov. Code, § 11340 et seq.).[1]  Finding that the CDCR "substantially failed to comply" with mandatory procedural requirements of the APA, the trial court invalidated the regulations in their entirety.  (§ 11350, subd. (a).)  We shall affirm the judgment.

**BACKGROUND**

California law, which provides for capital punishment, offers persons sentenced to death a choice between execution by lethal injection or by lethal gas.  (Pen. Code, § 3604, subd. (b).)  The responsibility to develop procedures for administering both forms of execution lies with the CDCR.  (Pen. Code, § 3604, subd. (a).)

Until 2006, the CDCR's standards for conducting lethal injections were set forth in a procedural manual known as Operational Procedure No. 0-770  (OP 770).  In

---

[1] Unless otherwise indicated, all statutory references are to provisions of the APA set forth in the Government Code.

1

December of that year a federal court ruled that the protocol prescribed by OP 770 violated the Eighth Amendment's prohibition against cruel and unusual punishment. (*Morales v. Tilton* (N.D.Cal. 2006) 465 F.Supp.2d 972.) In order to cure this deficiency, the CDCR substantially revised OP 770 on May 15, 2007.

Later that year, condemned inmates filed a complaint in the Marin County Superior Court contending that any procedure employed to carry out the death penalty must be adopted through the regulatory approval process prescribed by the APA, rather than as an agency operational procedure. The superior court agreed. Finding that the revised version of OP 770 constituted an "underground regulation,"[2] the court enjoined the CDCR from executing condemned inmates by lethal injection "unless and until" the applicable regulations were enacted in "full compliance with the Administrative Procedure Act." The CDCR appealed and, in 2008, Division Five of this court affirmed the trial court's decision. (*Morales v. California Dept. of Corrections & Rehabilitation* (2008) 168 Cal.App.4th 729.) In response to that ruling, the CDCR undertook to promulgate a lethal injection protocol through the APA rulemaking process.[3]

---

[2] " 'Underground regulation' means any guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule, including a rule governing a state agency procedure, that is a regulation as defined in section 11342.600 of the Government Code, but has not been adopted as a regulation and filed with the Secretary of State pursuant to the APA and is not subject to an express statutory exemption from adoption pursuant to the APA." (Cal. Code Regs., tit. 1, ch. 2, § 250, subd. (a).)

[3] While the CDCR's appeal of the Marin County Superior Court decision was pending in this court, the United States Supreme Court issued its opinion in *Baze v. Rees* (2008) 553 U.S. 35 (*Baze*). *Baze* rejected a claim by a condemned inmate that Kentucky's three-drug legal injection method of capital punishment, which was similar to that proposed in OP 770, posed an unacceptable risk of significant pain, and was cruel and unusual within the meaning of the Eighth Amendment. As later explained, the CDCR could not have relied on *Baze* when it decided to use a three-drug legal injection method, because that method was selected prior to the decision in *Baze*. Nonetheless, the CDCR relies upon *Baze* and subsequent federal decisions rejecting challenges to states' three-drug protocols for the proposition, unchallenged in this case, that California's three-drug protocol passes constitutional muster. (See, e.g., *Dickens v. Brewer* (9th Cir. 2011)

The process commenced on May 1, 2009, when the CDCR submitted to the Office of Administrative Law (OAL), and made available to the public upon request, a draft regulation[4] and notice of proposed regulatory action, as well as an "initial statement of reasons" (ISOR) explaining the rationale of the proposed regulations. (§ 11346.2, subds. (a), (b).) The agency also posted notice of the proposed rulemaking in all of the state's prisons, including multiple postings in San Quentin Prison, where executions are carried out and condemned male prisoners are housed. During the initial 60-day period of public comment and two subsequent periods additionally allowed, the CDCR received a total of 29,416 letters, facsimiles and emails from the public. At a six-hour public hearing in Sacramento on June 30, 2009, 102 people expressed their views on the proposed regulations.

On January 4, 2010, the CDCR provided public notice of modifications to the proposed regulation in response to the written comments it had received, and set a 15-day comment period on the modifications. On April 29 of that year, the CDCR submitted the new regulations for review by the OAL. On June 8, the OAL disapproved the regulations, finding, among other things, that CDCR had failed to comply with the clarity, consistency and necessity standards of the APA (§§ 11342.2, 11342.580, 11349) and several APA procedural requirements. On June 11, the CDCR published another notice to the public addressing the issues the OAL had raised, allowing a 15-day comment period. On July 6, the CDCR resubmitted modified regulations, which were approved by the OAL on July 30. The regulations, now set forth in California Code of Regulations, title 15, sections 3349 through 3349.4.6, took effect 30 days later, on August 29, 2010.

_____

631 F.3d 1139, 1144-1146 (Arizona); *Rhoades v. Reinke* (9th Cir. 2011) 671 F.3d 856, 858-863 (Idaho).)

[4] The regulations initially submitted to the OAL were almost identical to the execution protocols set forth in the May 15, 2007 version of OP 770.

3

## PROCEEDINGS BELOW

Under the APA, "no regulation adopted is valid or effective unless consistent and not in conflict with the statute and reasonably necessary to effectuate the purpose of the statute." (§ 11342.2.) A regulation "may be declared to be invalid for a substantial failure to comply with [the APA]" or if the determination of the promulgating agency that it is reasonably necessary to effectuate the purpose of the statute "is not supported by substantial evidence." (§ 11350, subds. (a), (b)(1).)[5]

On August 2, 2010, respondent Mitchell Sims filed a complaint seeking declarative and injunctive relief.[6] The first cause of action alleged that several significant provisions of the regulations approved by the OAL "are entirely unnecessary to effectuate the purpose of Penal Code section 3604[, subdivision] (a)[7] and impose undue burdens on those effected by the regulations." The gist of the claim is that the use of one of the three drugs in the three-drug regulatory formula—pancuronium bromide, a neuromuscular agent that paralyzes the body's voluntary muscles—"is unnecessary and dangerous, and serves only to increase the risk that the condemned person will suffer excruciating pain" and "the rulemaking file makes clear that there are no countervailing benefits or compelling reasons to use pancuronium bromide as part of the execution process."

_____

[5] " 'Necessity' means the record of the rulemaking proceeding demonstrates by substantial evidence the need for a regulation to effectuate the purpose of the statute, court decision, or other provision of law that the regulation implements, interprets, or makes specific, taking into account the totality of the record. For purposes of this standard, evidence includes, but is not limited to, facts, studies, and expert opinion." (§ 11349, subd. (a).)

[6] On September 11, 2010, condemned inmate Albert Greenwood Brown, Jr. was granted leave to intervene as a plaintiff, as was condemned inmate Kevin Cooper on July 29, 2011. The complaints filed by Brown and Cooper were virtually identical to that filed by Sims. The three plaintiffs thereafter moved for summary judgment jointly.

[7] Penal Code section 3604, subdivision (a), provides that "[t]he punishment of death shall be inflicted by the administration of a lethal gas or by an intravenous injection of a substance or substances in lethal quantity sufficient to cause death, by standards established under the direction of the Department of Corrections."

4

After finding that the rulemaking file contained substantial evidence favorable to the use of pancuroniam bromide, or confirmed the experience of other states that proper application of the same three-drug formula authorized by the regulations "will result in a rapid death of the inmate without undue pain or suffering," the trial court, on December 19, 2011, denied respondents' motion for summary judgment on their first cause of action alleging no substantial evidence showing the use of pancuronium bromide "reasonably necessary" to effectuate the purpose of the proposed regulations.

However, in the same ruling, the trial court granted respondents' motion for summary judgment with respect to the second cause of action and invalidated the regulations, based upon its finding that undisputed evidence shows that the CDCR "substantial[ly] fail[ed] to comply with the mandatory procedural requirements of the Administrative Procedure Act" when it adopted the regulations, in violation of section 11350, subdivision (a).

The CDCR admitted below, as it does here, that it did not actually comply with many of the requirements of the APA that respondents claim constitute a substantial failure to comply. Specifically, the CDCR admitted it (1) failed to explain in the ISOR and "final statement of reasons" (FSOR) (§ 11346.9) its consideration and rejection of alternatives to the three-drug protocol, as required by sections 11346.2, subdivision (b)(3), and 11346.9, subdivision (a)(3), and falsely represented that it relied on the Supreme Court decision in *Baze, supra,* 553 U.S. 35, which validated a three-drug lethal injection method of capital punishment but had not been decided when the CDCR rejected alternatives to that method; (2) failed to make the complete rulemaking file available to the public for inspection as of the date the notice of proposed action was published (§ 11347.3), and delayed making the rulemaking file available until June 11, 2009, six weeks after publication of the notice of proposed action, when fewer than three weeks remained in the comment period; (3) failed to identify the latest version of OP 770 as the primary basis of the proposed lethal injection protocol; (4) failed to summarize and respond to about two dozen written comments specifically directed at the agency's proposed action explaining whether and how the proposed regulations had been changed

5

to accommodate each objection or recommendation, as required by section 11346.9, subdivision (a)(3); and (5) included irrelevant information in the rulemaking file made available to the public.

After respondents voluntarily dismissed the first cause of action, the judgment invalidating the regulations for substantial failure to comply with the requirements of the APA was entered on February 21, 2012. The court permanently enjoined the CDCR from administering executions by lethal injection until new regulations were promulgated in compliance with the APA, and also from administering executions by lethal gas until regulations applicable to that method of execution were properly adopted. The CDCR was also permanently enjoined from administering the execution of any condemned female inmate until applicable regulations were promulgated that complied with the requirements of the APA.

The CDCR filed a timely notice of appeal on April 26, 2012.

## THE TRIAL COURT'S RULING

A regulation "may be declared to be invalid for a *substantial failure* to comply with [the APA]." (§ 11350, subd. (a), italics added.)

The trial court's 17- page final ruling granting summary judgment identified and discussed its reasons for concluding that, "collectively, if not singly," the deficiencies in the CDCR's rulemaking process "constitute a substantial failure . . . to comply with procedures mandated by the Administrative Procedures Act," requiring invalidation of the regulations regarding lethal injection in their entirety.

The deficiencies in the CDCR's rulemaking process the court believed most clearly "substantial," and sufficient in and of themselves to warrant invalidation of the proposed regulation in its entirety, relate to APA requirements that agencies proposing regulations timely provide the interested public certain types of relevant information. The court found that the ISOR and FSOR failed to describe alternatives to the proposed three-drug protocol, failed to provide a sufficient rationale for rejecting those alternatives, and failed to explain, with supporting documentation, why a one-drug alternative would not be as effective or better than the adopted three-drug procedure, as required by the

6

APA. (§§ 11346.2, subd. (b)(3)(A) and 11346.9, subd. (a)(4).) The ISOR and FSOR both stated that the CDCR "considered alternatives to the existing three-chemical process, including a one-chemical process" and was "guided by the United States Supreme Court's decision in [*Baze, supra,*] 553 U.S. 35," which upheld Kentucky's use of a three-chemical process. However, as the ruling explains and the CDCR concedes, the agency's consideration of alternatives was not guided by the decision in *Baze* because the three-drug protocol was decided upon by Governor Schwarzenegger in May 2007, well before the issuance of *Baze*, and the issue was not revisited after *Baze* was decided.[8]

The failure to forthrightly discuss alternatives to the three-drug method was particularly significant, the court stated, because many who commented upon the proposed regulations had claimed that use of pancuronium bromide was unnecessary, dangerous, and created a risk of excruciating pain, or had raised the issue of a barbiturate-only protocol; the CDCR had taken the position in a federal lawsuit that a single-drug formula consisting of five grams of sodium thiopental was sufficient to cause death in a constitutional manner; and the CDCR's expert had recommended adoption of a single-drug formula.

The court also found the CDCR substantially failed to make the complete rulemaking file available for public inspection in the timely manner required by the APA. (§ 11347.3, subd. (a).) The file was not made available to the public until June 11, 2009,

_____

[8] With respect to alternatives, the FSOR states only that "[t]he Department has determined that no alternative considered would be more effective in carrying out the purpose of this action or would be as effective and less burdensome to affected persons." Later, the document reiterates that the agency had " 'considered alternatives to the existing three-chemical process, including a one-chemical process.' " The CDCR did not argue below, nor does it now claim, that these conclusory statements satisfy the requirement that the FSOR submitted to the OAL must include "a determination *with supporting information* that no alternative considered by the agency would be more effective in carrying out the purpose for which the regulation is proposed or would be as effective and less burdensome to affected private persons than the adopted regulation." (§ 11346.9, subd. (a)(4), italics added.) Nor has the CDCR sought to explain how the two statements in the FSOR rectify the agency's failure to say anything about the consideration of alternatives in the ISOR or elsewhere at the time the rulemaking process commenced.

six weeks after publication of the notice of proposed action on May 1, 2009, and less than three weeks before the end of the public comment period on June 30, 2009. Additionally, the rulemaking file did not contain several significant documents the CDCR had relied upon in drafting the proposed regulations, which were therefore required by the APA to be included in the file.[9] (§ 11347.3, subd. (b).)

The trial court's determination that the CDCR substantially failed to comply with the APA also rested on the agency's failure to respond to public comments in the manner and as fully as the APA requires. The APA provides that an agency's FSOR "shall include . . . [¶] . . . [a] summary of each objection or recommendation made regarding the specific adoption . . . proposed, together with an explanation of how the proposed action has been changed to accommodate each objection or recommendation, or the reasons for making no change." (§ 11346.9, subd. (a)(3).)[10] The court's ruling states that the CDCR received over 29,400 written comments on the proposed regulations and neither responded to nor summarized approximately two dozen comments. The court concluded that despite the large number of comments the CDCR properly addressed, its failure to respond to or summarize approximately 24 comments could not be treated as merely a "technical defect." "By not summarizing and responding to these comments," the court stated, "the Department did not give substance to the central APA requirement that all

---

[9] The documents were OP 70; the statement of decision of the Federal District Court in *Morales v. Tilton, supra*, 465 F.Supp.2d 972 (declaring the protocol prescribed by OP 770 violative of the Eighth Amendment); the reports or declarations of experts received in evidence in *Morales v. Tilton;* the lethal injection protocol employed by the Federal Bureau of Prisons; and responses by 15 states to a survey conducted by the CDCR regarding methods of executing condemned prisoners.

[10] Subdivision (a)(3) of section 11346.9 goes on to state that "[t]his requirement applies only to objections or recommendations specifically directed at the agency's proposed action or to the procedures followed by the agency in proposing or adopting the action. The agency may aggregate and summarize repetitive or irrelevant comments as a group, and may respond to repetitive or summarily dismiss irrelevant comments as a group. For the purposes of this paragraph, a comment is 'irrelevant' if it is not specifically directed at the agency's proposed action or to the procedures followed by the agency in proposing or adopting the action."

8

interested persons be afforded a meaningful chance to have their objections heard and to inform the rulemaker's decision." The court added that some of the responses to comments the CDCR did make "are incomplete, incorrect, or inadequate," noting, as an example, that about 15 commentators objecting to the use of pancuronium bromide did so on the basis of "*various medical and humanitarian* grounds," yet the CDCR answered by relying on the recent decision in *Baze v. Rees, supra*, 553 U.S. 35, which did not relate to those concerns, and erroneously indicated the three-chemical protocol had been selected on the basis of the Supreme Court's analysis in *Baze*.

Concluding that the foregoing deficiencies, all of which were supported by "undisputed evidence," "infect[ed] the entire regulatory scheme" prescribed by the APA, and "undermined meaningful public participation in the rulemaking process," the court concluded it was necessary to declare the proposed lethal injection protocol, "as a whole," invalid.

The trial court found the CDCR also failed to comply with the APA in other respects, but these deficiencies only justified the invalidation of individual regulations, or the addition of information improperly omitted from the regulation (such as the fiscal impact of the regulation), not invalidation of the regulations in their entirety. Thus the court found the CDCR violated the APA requirement that it explain why a regulatory provision "is reasonably necessary to carry out the purpose and address the problem for which it was proposed" (§ 11346.2, subd. (b)(1)), because the CDCR provided no explanation why certain procedures were required to take place during the five days before execution. For example, the ISOR failed to explain why it was necessary for unit staff to monitor the inmate and to complete documentation every 15 minutes during the five-day period; "why *all* personal property must be removed from the inmate's cell"; or "why inmates must be bound with waist restraints during visits."

The court also found that "some" of the regulations did not comply with the APA-mandated standard of "clarity," which requires that regulations be written or displayed so that their meaning "will be easily understood by those persons directly affected by them." (§ 11349, subd. (c).) By way of example, the court cited a regulation related to the

9

warden's review of information bearing on the sanity of a condemned inmate. In the court's view, the regulation requires the inmate's counsel to submit such information no later than seven days prior to the scheduled execution, whereas the FSOR indicates such information can be offered to and received by the warden "at any time" prior to execution, thereby creating an ambiguity rendering the regulation invalid. The court also found that the term "reputable citizen," used in a regulation restricting the number of witnesses to an execution, "may have more than one meaning" and was, therefore, also ambiguous.

The trial court also agreed with respondents that the CDCR's notice of proposed adoption of regulation failed to estimate the additional costs or savings it would incur in reasonable compliance with the proposed regulation, as required by the APA. (§ 11346.5, subd. (a)(6).) In making this finding, the court rejected the CDCR's contention that it was not required to provide such estimates because " 'the costs and fiscal impacts of lethal-injection executions are caused by the fact that the Penal Code, not a regulation, mandates this type of execution.' "

Lastly, although the court ruled that "[t]he all-male plaintiffs do not have standing to raise the [e]qual [p]rotection challenges on behalf of condemned female inmates, because they do not claim the disparate treatment they hypothesize," it nevertheless permanently enjoined the CDCR from executing any condemned female inmate, or executing any inmate under sentence of death by lethal gas, until applicable regulations were properly promulgated.

## STANDARD OF REVIEW

"On appeal we exercise 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law.' " (*Seo v. All-Makes Overhead Doors* (2002) 97 Cal.App.4th 1193, 1201, quoting *Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222.) As respondents correctly point out, where, as here, neither party claims there are any triable issues of material fact, the appellate court independently

interprets and applies the law to undisputed facts. That is, "[i]n the context of a motion for summary judgment, questions of law include whether a triable issue of material fact exists and whether the moving party is entitled to judgment as a matter of law." (*Coburn v. Sievert* (2005) 133 Cal.App.4th 1483, 1492, citing Code Civ. Proc., § 437c, subds. (c) & (f); see *Certain Underwriters of Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972.)

We also agree with respondents that courts reviewing regulations for compliance with the APA owe no deference to the promulgating agency's opinion that it complied with the prescriptions of the APA. The CDCR does not contest this point. As we noted in *California Advocates for Nursing Home Reform v. Bonta* (2003) 106 Cal.App.4th 498, " 'Agencies are not normally delegated power to determine authoritatively whether they complied with generally applicable rule-making procedures, . . . As a result, courts may usually determine the lawfulness of agencies' compliance with those rule-making procedures entirely de novo, simply substituting their judgment on that question for that of the agencies.' " (*Id.* at p. 506, quoting Bonfield, State Administrative Rule Making (1986) § 9.2.12, p. 582.) Additionally, a court reviewing regulations for compliance with the APA "shall not" consider the approval of the regulations by OAL "in any action for declaratory relief." (§ 11350, subd. (c).)

## ANALYSIS

The CDCR contends: (1) there was no substantial failure to comply with the APA because the high level of public participation in the rulemaking process rendered harmless its failure to actually comply with certain provisions of the APA; (2) the trial court lacked authority to review the regulations for clarity; (3) the court lacked authority to review the regulations for "necessity"; (4) the absence of a fiscal impact report does not violate the APA; and (5) the court erred in enjoining the execution of condemned female inmates and executions by means of lethal gas.

## I.

As we have said, the judgment rests on a provision of the APA stating that a "regulation . . . may be declared to be invalid for a *substantial* failure to comply with this

11

chapter." (§ 11350, subd. (a), italics added.) The parties cite no case, and we are aware of none, defining "substantial failure" to comply with the APA or a comparable statute. The two federal cases the CDCR relies upon for application of the harmless error rule, *United States v. Bearden* (5th Cir. 1981) 659 F.2d 590 (*Bearden*) and *United States v. Martinez* (9th Cir. 1970) 436 F.2d 12 (*Martinez*), do not involve the APA or comparable statute, but they do pertain to a statutory scheme that, like the APA, is enforced upon a court's determination "of *substantial failure* to comply with the provisions" of the measure. (28 U.S.C. § 1867, subds. (a), (b), (c).) *Bearden* and *Martinez* both interpret and apply provisions of the federal Jury Selection and Service Act of 1968, the chief purposes of which are "to ensure that potential grand and petit jurors are selected at random from a representative cross section of the community and that all qualified citizens have the opportunity to be considered for service." (*Bearden,* at p. 593, citing 28 U.S.C.A. § 1861.) The finding in both cases was that the failures of responsible government officials to comply with the federal act were not "substantial" because they did not frustrate these two important general principles. As stated in *Bearden,* "[a] substantial violation of the Act will be found *only when these principles are frustrated.* Mere 'technical' deviations from the Act or even a number of them are insufficient. [Citations.] [¶] The same analysis is applied for claims alleging a failure to comply with the Local Plan. The court must determine whether noncompliance with the Plan has resulted in a substantial violation of the Act *and its underlying principles.* [Citations.] The mere claim the Plan has been violated is insufficient, absent a further showing the Act itself *and its goals* have been frustrated." (*Bearden*, at p. 601, italics added.)[11]

---

[11] For example, the *Bearden* court found that "while the practice of granting permanent rather than temporary [juror] excusals failed to comply with the Act, it did not rise to the level of a *substantial* violation. Even assuming all 212 permanent excusals [of jurors] were wrongful, this amounts to only .7% of the persons on the qualified wheels, an insignificant amount. Moreover, there is no evidence indicating the excusals were made on the basis of improper subjective criteria." (*Bearden, supra*, 659 F.2d at p. 609, fn. omitted, italics added.)

The reasoning of *Bearden* and *Martinez* is consistent with the concept of substantial compliance articulated by our Supreme Court more than 50 years ago in *Stasher v. Hager-Haldeman* (1962) 58 Cal.2d 23 (*Stasher*), which is still authoritative. (See, e.g., *North Pacifica LLC v. California Coastal Comm.* (2008) 166 Cal.App.4th 1416, 1431-1432.)  As stated in *Stasher*, "[s]ubstantial compliance, as the phrase is used in the decisions, means *actual* compliance *in respect to the substance essential to every reasonable objective of the statute*.  But when there is such actual compliance as to all matters of substance then mere technical imperfections of form . . . should not be given the stature of noncompliance . . . ." (*Stasher,* at p. 29, first italics added by *Stasher* court, second added by this court.)  Substantial compliance, an affirmative proposition, is the counterpart, or obverse, of the substantial failure to comply, which negatively expresses the same idea.  Following *Stasher*, it is therefore proper to say that noncompliance is insubstantial, or "harmless," only where it does not compromise any "reasonable objective" of the APA.

The CDCR argues that its failure to "fully comply with every technical requirement" of the APA constitutes harmless error because it did not prevent the agency from achieving what the CDCR considers the overarching purpose of the APA: "providing an opportunity for those affected by the regulation to provide input about it." Emphasizing the "wealth of public participation" the agency afforded, the CDCR points out that it responded to 29,416 separate pieces of correspondence submitted by groups and individuals interested in the proposed lethal injection protocol, posted notice of the regulatory action in all 33 California prisons, and held a lengthy hearing at which 102 people provided input.

The CDCR's view of the purpose of the APA is far too limited and simplistic.  It is of course true, as the CDCR repeatedly reminds us, that the APA is designed "to provide a procedure whereby people to be affected may be heard on the merits of the proposed rules" (*Armistead v. State Personnel Board* (1978) 22 Cal.3d 198, 204), and to ensure "meaningful public participation in the adoption of administrative regulations by state agencies. (*California Optometric Assn. v. Lackner* (1976) 60 Cal.App.3d 500, 506; *Voss*

13

*v. Superior Court* (1996) 46 Cal.App.4th 900, 908-909.) But affected people cannot be thought to have been heard "on the merits," and public participation cannot be considered "meaningful," simply because large numbers of interested people were provided an opportunity to be heard. The public participation contemplated by the APA is not a numbers game. A hearing is "on the merits" and "meaningful" only if the interested public has timely received all available information that is relevant to the proposed regulations, accurate, and as complete as reasonably possible. The public that participated in the CDCR's rulemaking process was not so fully informed.

The trial court invalidated the lethal injection protocol in its entirety primarily due to the consequences of the CDCR's noncompliance with three provisions of the APA: section 11346.2, subdivision (b), which pertains to the content of the ISOR; section 11346.9, subdivision (a), which pertains to the content of the FSOR; and section 11347.3, which defines the rulemaking file required to be published in the California Regulatory Notice Register and made available to the interested public. As we have said, the CDCR violated these provisions by failing to set forth (in both the ISOR and FSOR) alternatives to the proposed three-drug lethal injection protocol; by failing to provide a rationale for rejecting those alternatives; by failing to explain, with supporting documentation, why the three-drug alternative was superior to the use of a single drug; by falsely representing that it selected the three-drug alternative on the basis of the Supreme Court decision in *Baze, supra*, 553 U.S. 35; by failing to include documents required to be disclosed in its rulemaking file; and by failing to make the rulemaking file available for public inspection until six weeks after it was required to do so, when less than three weeks remained in the period within which public comment was allowed. The requirements violated by the foregoing conduct are certainly not, as the CDCR says, merely "technical."

The "enormous amount of public participation" for which the CDCR takes credit—which was undoubtedly primarily attributable to the high level of public interest in the death penalty—cannot diminish the significance of these failures; otherwise, rulemaking in areas of high public interest would be subject to a less rigorous standard of

14

compliance than that applicable to rulemaking in areas of lesser interest to the public, which would be absurd. More importantly, the aim of the APA is not just a high level of public participation in the rulemaking process, but a high level of "*meaningful*" participation in that process. (*California Optometric Assn. v. Lackner, supra,* 60 Cal.App.3d at p. 506; *Voss v. Superior Court, supra,* 46 Cal.App.4th at pp. 908-909.) Meaningful public participation on the merits of a proposed regulation takes place only when there is *actual* compliance with the "basic minimum procedural requirements for the adoption, amendment, or repeal of administrative regulations" established under the APA. (§ 11346, subd. (a).) These include timely provision to the public of a statement of the purpose of the proposed regulations, the rationale of the agency's determination that the regulations are necessary to carry out that purpose, the information or documents the agency relied upon in proposing adoption of the regulation, the alternatives to the proposed regulation the agency considered reasonable, and the basis or bases upon which the agency rejected those alternatives. (§ 11346.2.) As we have seen, the 102 people who attended the June 30, 2010 hearing and the 29,416 who submitted written comments were not made aware (or timely made aware) of much of the information relied upon by the CDCR in proposing the three-drug protocol, and were, in fact, misled about this. Nor were they made aware of the alternatives to that protocol, which the CDCR deemed reasonable and considered, or the CDCR's reasons for rejecting those alternatives. As earlier noted, the CDCR's failure to discuss the one-drug lethal injection alternative in the FSOR, which did not correct but perpetuated omissions in the ISOR, was justifiably considered "particularly significant" by the trial court because many commentators—who felt that use of pancuronium bromide in the three-drug method "was unnecessary, dangerous, and creates a risk of excruciating pain"—believed the one-drug method superior. Nor was the public provided other important information required by the APA to be included in the rulemaking file, and that file was not made available to the public until June 11, 2009, six weeks after the CDCR published notice of the proposed regulation and less than three weeks before expiration of the public comment period.

15

Because undisputed evidence shows there was not "actual compliance" with the basic minimum procedural requirements for the adoption of administration regulations established by the APA, we shall affirm the judgment insofar as it invalidates the CDCR's proposed regulations in their entirety for substantial failure to comply with requirements imposed by sections 11346.2, 11346.9, subdivision (a)(4), and 11347.3, subdivisions (a) and (b).[12]

## II.

As previously explained, the trial court found that particular provisions of the proposed regulations failed to comply with the "necessity" and "clarity" requirements of the APA. The CDCR claims the trial court lacked authority to make these findings because the question whether proposed regulations satisfy these requirements is committed to the OAL, not the courts. Respondents disagree, but claim we should not address the issues because the CDCR failed to raise them in the trial court. The CDCR concedes it did not raise the issues below, but argues that an appellant may newly raise a pure issue of law presented on undisputed facts where, as here, "important issues of public policy are at issue." (*In re Marriage of Hinds* (1988) 205 Cal.App.3d 1398, 1403;

---

[12] Since the judgment we affirm declares the regulations establishing the lethal injection protocol *entirely* invalid, and the CDCR will need to commence a new rulemaking process, we need not determine whether the judgment can also be sustained on the ground of the trial court's findings that the CDCR also failed to substantially comply with provisions of the APA other than sections 11346.2, 11346.9, subdivision (a)(4), and 11347.3, subdivisions (a) and (b).

As noted, one such ground is the court's finding that, in violation of section 11346.9, subdivision (a)(3), the CDCR failed to summarize and respond to "two dozen or so" public comments, as required by section 11346.9, subdivision (a)(3). The court concluded that "[b]y not summarizing and responding to these comments, the [agency] did not give substance to the central APA requirement that all interested persons be afforded a meaningful chance to have their objections heard and to inform the rule-maker's decision;" and therefore "substantially failed" to comply with subdivision (a)(3) of section 11346.9. Although this failure was among those the trial court relied upon in invalidating the three-drug protocol in its entirety, our affirmance of the judgment does not rely on this finding and nothing in this opinion is meant to suggest that we take any position on the propriety of that finding.

see, e.g., *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 654, fn. 2; *People v. Runyan* (2012) 54 Cal.4th 849, 859, fn. 3.)

We agree with the CDCR that the issue whether an OAL finding of compliance with the "necessity" and "clarity" requirements of the APA is subject to judicial review is a matter of continuing public interest. It may also continue to be an issue in the rulemaking procedure mandated by our decision in this case, and is briefed by the parties. For these reasons we shall address the issue.

The necessity and clarity requirements are dealt with in three different portions of the APA, which appear in articles 5, 6, and 8 of title 2, division 3, chapter 3.5 of the Government Code. Section 11346.2, in article 5 ("Public Participation: Procedure for Adoption of Regulations"), requires agencies subject to the APA to prepare and submit to the OAL a copy of the express terms of a proposed regulation, and directs them, among other things, to "draft the regulation in plain English"; that is, the regulation should be drafted "in plain, straightforward language, avoiding technical terms as much as possible, and using a coherent and easily readable style." (§ 11346.2, subd. (a)(1).) Section 11346.2 also requires the submitting agency to provide the OAL the "rationale" for its determination that the proposed regulation "is reasonably necessary to carry out the purpose for which it is proposed." (§ 11346.2, subd. (b)(1).)

Section 11349.1, in article 6 ("Review of Proposed Regulations"), requires the OAL to review all regulations adopted pursuant to the procedure specified in article 5 and submitted to it for publication in the California Code of Regulations and "make determinations" as to, among other standards, "Necessity" and "Clarity." (§ 11349.1, subd. (a).) " 'Necessity' means the record of the rulemaking proceeding demonstrates by substantial evidence the need for a regulation to effectuate the purpose of the statute, court decision, or other provision of law that the regulation implements, interprets, or makes specific, taking into account the totality of the record. For purposes of this standard, evidence includes, but is not limited to, facts, studies, and expert opinion." (§ 11349, subd. (a).) " 'Clarity' means written or displayed so that the meaning of

17

regulations will be easily understood by those persons directly affected by them."
(§ 11349, subd. (c).)

As earlier noted, section 11350, in article 8 ("Judicial Review"), provides that "[a]ny interested person may obtain a judicial declaration as to the validity of any regulation . . . by bringing an action for declaratory relief in the superior court in accordance with the Code of Civil Procedure." (§ 11350, subd. (a).)

The CDCR's claim that the review of regulations for "necessity" and "clarity" is exclusively committed to the OAL cannot be squared with the scheme described by the foregoing provisions of the APA. To begin with, section 11350 specifically authorizes a "*judicial* declaration" as to the validity of a regulation that has previously been promulgated. The statutory authority of the OAL is limited to the review of *proposed* regulations prior to their submission for publication in the California Code of Regulations Supplement and transmittal to the Secretary of State. (§ 11349.1, subd. (a).) Moreover, the APA was designed not simply to advance meaningful public participation in the rulemaking process, but also to create " 'an administrative record assuring effective judicial review.' " (*Voss v. Superior Court, supra,* 46 Cal.App.4th at p. 908, quoting *California Optometric Assn. v. Lackner, supra*, 60 Cal.App.3d 500, 506.) Finally, in adjudicating the declaratory relief actions authorized by the APA, courts have entertained claims that regulations lack the "clarity" or "necessity" mandated by the APA. (See, e.g., *Californians for Safe Prescriptions v. California State Bd. of Pharmacy* (1993) 19 Cal.App.4th 1136, 1153-1155 ["clarity"]; *California Forestry Assn. v. California Fish & Game Commission* (2007) 156 Cal.App.4th 1535, 1552-1554 ["necessity"].)

Like the United States Supreme Court, the California Supreme Court has emphasized that a strong presumption in favor of judicial review operates when it is claimed that an administrative agency's action is in excess of its delegated powers and contrary to a specific statutory prohibition. (*International Assn. of Fire Fighters, Local 188, AFL-CIO v. Public Employment Relations Bd.* (2011) 51 Cal.4th 259, 270 (*International Assn. of Fire Fighters*), citing *Leedom v. Kyne* (1958) 358 U.S. 184, 188.) Accordingly, California courts "will not infer a legislative intent to entirely deprive the

18

superior courts of judicial authority in a particular area; the Legislature must have expressly so provided or otherwise clearly indicated such an intent. [Citations.]" (*International Assn. of Fire Fighters,* at p. 270, citing, e.g., *Garrison v. Rourke* (1948) 32 Cal.2d 430, 435-436.)

The Legislature that enacted the APA not only failed to indicate any intent to deprive the superior courts of authority to review an agency's compliance with a provision of the APA after a finding by the OAL that the agency had complied; it unambiguously indicated the *opposite* intent. Subdivision (c) of section 11350 states that "[t]he approval of a regulation by the [OAL] . . . shall not be considered by a court in any action for declaratory relief brought with respect to a regulation." The text of the APA thus makes clear that initial review of a proposed regulation by the OAL is not exclusive but subordinate to judicial review.

Finally, the Legislature knows how to insulate a provision of the APA from judicial review when it wants to do so. Section 11346.45, which applies to proposed regulations that "involve complex proposals or a large number of proposals that cannot easily be reviewed during the comment period," requires the agency to involve parties who would be subject to the proposed regulations "in public discussions regarding those proposed regulations" prior to publication of the required notice. Subdivision (d) of this statute declares that "[t]he provisions of this section shall not be subject to judicial review or [to OAL review pursuant to] section 11349.1." This express exclusion from judicial review clearly indicates the Legislature intended no others to be inferred. No such exemption from judicial review applies to the "necessity" or "clarity" requirements set forth in section 11346.2. Given the absence of any legislative indication that the "necessity" and "clarity" requirements of the APA are exempt from judicial review, the CDCR fails to rebut the presumption of judicial review of administrative agency action.

The CDCR's contention that responsibility to review a regulation for "clarity" or "necessity" "belongs solely to the Office of Administrative Law" rests entirely on our opinion in *California Assn. of Medical Products Suppliers v. Maxwell-Jolly* (2011) 199 Cal.App.4th 286 (*CAMPS*).) In that case, the trial court denied a trade association's

petition for writ of mandate and complaint for declaratory and injunctive relief, in which it sought the invalidation of regulations adopted by the Department of Health Care Services to set upper billing limits (UBL) for providers of certain medical equipment and supplies to Medi-Cal recipients. The plaintiff in *CAMPS* argued that the Department's adoption of the UBL was outside its statutory authority and asked us to invalidate it because, among other alleged deficiencies, it lacked the minimum level of "clarity" required by the APA. We rejected the argument because we agreed with the Department that the issue "is for the Office of Administrative Law, not this court, to review pursuant to Government Code section 11349.1, subdivision (a), . . . [which] provides that '[t]he office shall review all regulations adopted . . . and make determinations using all of the following standards: [[¶] . . . [¶] (3) Clarity.' " (*CAMPS*. at p. 319, citing Gov. Code, § 11349.1, subd. (a)(3).)

CAMPS does not assist the CDCR because it does not address the pertinent substantive legal issues. To begin with, we did not in *CAMPS* question the appropriateness of our adjudicating the plaintiff's claim that the Department violated the "necessity" requirement of the APA. Concluding the UBL was "a rational response to the Department's efforts to prevent fraud and abuse . . . and was not arbitrary and capricious," we saw "no basis for invalidating the UBL for lack of reasonable necessity." (*CAMPS*. *supra,* 199 Cal.App.4th at p. 318.) Furthermore, with respect to the "clarity" requirement, the plaintiff in *CAMPS* failed to claim in its opening brief that (1) an unclear regulation may amount to an arbitrary and capricious act by an agency where it is too vague to provide adequate notice of the conduct proscribed or prescribed, or to provide sufficiently definite guidelines for enforcement, and (2) a regulation could be so unclear that it rises to failure to substantially comply with the APA. We expressly declined to address these issues in *CAMPS* because the plaintiff in that case presented those arguments only "tardily" in a reply brief, "without explanation" or "legal authority." (*CAMPS,* at p. 319.) In short, we were not called upon in *CAMPS* to dispositively decide the authority of a trial court to review proposed regulations for compliance with the "clarity" requirement of the APA. That is not here the case. The CDCR's opening brief

20

takes the position that "exclusive authority to examine the regulations for clarity" rests with the OAL and respondents have contested the claim.

Nor do we think *Pulaski v. Occupational Safety & Health Stds. Bd*. (1999) 75 Cal.App.4th 1315 (*Pulaski*), which we relied on in *CAMPS*, applicable to the case at hand. *Pulaski* held that a trial court abused its discretion in striking a provision in a regulation as "unnecessary surplusage and ambiguous" because "it was not the court's function to clarify the standard . . . " for the administrative board, since "[t]he Legislature has expressly delegated to the OAL the responsibility for reviewing proposed regulations for 'clarity,' 'consistency' and 'nonduplication.' (Gov. Code, § 11349.1, subd. (a).)" (*Pulaski*, at p. 1332.)

There was no such abuse of discretion in the present case, as the trial court did not alter, amend, or clarify any OAL regulation. With respect to "necessity," it simply determined the ISOR "fail[ed] to describe the purpose and/or the rationale for the agency's determination" that it was necessary to monitor the inmate continuously for five days prior to execution, and to document this every 15 minutes; to remove all personal property from the inmate's cell; and to bind inmates with waist restraints during visits. In making this ruling, the trial court cited not just the mandate of section 11346.2, subdivision (b)(1)—which requires the ISOR to state the "specific purpose of each regulation adopt[ed]" and "the rationale for the determination by the agency that each adoption . . . is reasonably necessary to carry out the purpose and address the problem for which it is proposed" (§ 11346.2, subd. (b)(1))—but also a provision of OAL's own regulations defining the criteria to be employed in reviewing whether proposed regulations are necessary. The OAL regulation provides that "[i]n order to meet the 'necessity' standard of Government Code section 11349.1, the record of the rulemaking proceeding shall include" both "[a] statement of the specific purpose" of a proposed regulation, and "information explaining why each provision of the adopted regulation is required to carry out the described purpose of the provision." (Cal. Code Regs., tit. 1,

21

§ 10, subd. (b) (1), (2).)[13]  The court did not expand or depart from the statutory and regulatory standards but enforced them.

With respect to "clarity," the trial court found that some of the regulations will not be "easily understood by those persons directly affected by them" (§ 11349, subd. (c)), such as a provision requiring submission to the warden of information bearing on the sanity of a condemned inmate.  The court pointed out that the proposed CDCR regulation on that subject (Cal. Code Regs., tit. 15, § 3349.3.2, subd. (a)(1)), which requires the inmate's counsel to submit such information no later than a week prior to the scheduled execution, conflicts with the CDCR's description of the effect of this regulation in an Addendum to the FSOR, which indicated this information could be offered to and received by the warden "at any time" prior to execution.  The court apparently found the ambiguity provided insufficient notice of the duty of counsel and might interfere with enforcement of the regulation.  The court also found that the term "reputable citizen" in a regulation restricting the number of witnesses to an execution "may have more than one meaning," which also might interfere with enforcement.

In making these rulings, the court cited provisions of OAL's regulatory guidelines establishing that "[a] regulation shall be presumed not to comply with the 'clarity' [requirement of Government Code section 11349.1]" if, among other things, "the regulation can, on its face, be reasonably and logically interpreted to have more than one meaning" or "the language of the regulation conflicts with the agency's description of the effect of the regulation."  (Cal. Code Regs., tit 1, § 16, subd.  (a)(1), (2).)  Citation of the OAL standard of review of a claimed violation of the "clarity" requirement cannot be compared to the conduct condemned in *Pulaski*.  Moreover, the claim that authority to review whether proposed regulations comply with the "necessity" and "clarity"

---

[13] The OAL regulation goes on to state that the explanatory information "shall include, but is not limited to, facts, studies, or expert opinion.  When the explanation is based upon policies, conclusions, speculation, or conjecture, the rulemaking record must include, in addition, supporting facts, studies, expert opinion, or other information." (Cal. Code Regs., tit. 1, § 10, subd. (b)(2).)

requirements of the APA rests *exclusively* with the OAL, precluding judicial review, was never presented in *Pulaski* and certainly not decided.

We conclude that, as a matter of law, the OAL's finding that proposed regulations comply with the "necessity" and "clarity" requirements—or comply with any of the other requirements the OAL is directed to review under section 11349.1, subdivision (a)—does not defeat the authority of the superior court to review regulations promulgated by an agency for compliance with those requirements.

## III.

The CDCR claims the trial court erred by "incorrectly conclud[ing] that the APA required the CDCR to provide an assessment of the regulations' fiscal impact."

The CDCR does not advance this claim in the form of legal argument. Its contention that it should not be required to comply with this requirement is set forth in its opening brief in a single paragraph consisting of four sentences, none of which advert to any case, statute, regulation, or other legal authority. [14] " 'Appellate briefs must provide argument and legal authority for the positions taken. "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." ' (*Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862.) 'We are not bound to develop appellants' arguments for them. [Citation.] The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived.' (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830; see also *Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 366, fn. 2; *People v. Stanley* (1995)

---

[14] The CDCR argues: "Contrary to the court's ruling, [the] CDCR was not required to assess the fiscal impact of the costs mentioned in the judgment, including increased staffing and overtime charges. Those are fixed costs that would be associated with any execution, whether [the]CDCR used lethal gas, a single drug, or the three-drug method set forth in the regulations. The Legislature, not [the] CDCR, has mandated executions by lethal injection. Therefore, because the bulk of the costs and fiscal impact of lethal-injection executions are caused by the fact that the Penal Code, not CDCR's regulation, mandates this type of execution, a fiscal impact assessment was not required in this case."

23

10 Cal.4th 764, 793.)" (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.) We could consider this argument waived, but we can easily dispose of it on the merits.

The APA states that the notice of proposed adoption of a regulation "shall include" an estimate of the "additional costs or savings, both direct and indirect, that a public agency necessarily incurs in reasonable compliance with [the proposed] regulations." (§ 11346.5, subd. (a)(6); see also *Pulaski, supra*, 75 Cal.App.4th 1315, 1328-1329.) The point of the CDCR's argument—that a fiscal impact assessment is not required here because the costs and fiscal impact of lethal-injection executions are caused by the statute authorizing this type of execution (Pen. Code, § 3604), not by the CDCR's regulations—seems fanciful. Since virtually all regulations subject to the APA implement a legislative enactment, acceptance of the CDCR's argument would render section 11346.5 meaningless. Moreover, Penal Code section 3604 does not mandate many of the administrative measures required by the proposed CDCR regulation, such as the monthly training of 20-member "lethal injection teams" and the use of particular drugs and an array of specialized medical equipment. (Cal. Code Regs., tit. 15, §§ 3349.1.2, subd. (a)(1); 3349.1.4, subd. (c)(1); 3349.4.5) As the trial court noted, the former warden of San Quentin prison, where the death penalty is carried out, stated that depending upon the way in which they were carried out, the cost of past executions has ranged from "between $70,000 to more than $200,000 per execution." The trial court did not err in finding that a fiscal impact assessment was required**.**

**IV.**

In its final ruling, the trial court pointed out that the CDCR has not promulgated regulations pertaining to execution by means of lethal gas or the execution in any way of female condemned inmates, and therefore no regulatory authority "to carry out the execution of condemned inmates by lethal gas, or to execute any condemned female inmate." Apparently on this basis, the judgment executed and filed by the court declares that CDCR "is permanently enjoined from carrying out the execution of any condemned inmate by lethal gas unless and until regulations governing execution by lethal gas are

24

drafted and approved following successful completion of the APA review and public comment process," and also "permanently enjoined from carrying out the execution of any female inmate unless and until regulations governing the execution of female inmates are drafted and approved" pursuant to the APA.

The CDCR claims it was error to enjoin it from carrying out executions by means of lethal gas and of female condemned inmates because respondents challenged only the lethal-injection regulations,[15] and the trial court found that respondents lacked standing to raise claims concerning condemned female inmates. The issues of execution by lethal gas and execution of condemned female inmates were raised below in connection with respondents' claim that the proposed regulation incorporated documents pertaining to these matters by reference, without subjecting them to the APA review process. (Cal. Code Regs., tit. 1, § 20.) The trial court rejected the claim because the CDCR represented that procedures regarding the use of lethal gas and the execution of female condemned inmates did not then exist, "would be the subjects of separate documents and/or regulations," and were not improperly incorporated by reference in the proposed regulations. "That said," the court observed, "unless and until these prospective, separate documents/regulations have been drafted and approved following successful completion of the APA review and public comment process, the [CDCR] has no authority under [Cal. Code] Regs., tit. 15, §§ 3349-3349.4.6, to carry out the execution of condemned inmates by lethal gas, or to execute any condemned female inmate."

Apparently on the basis of this judicial observation, the judgment, which at the request of the court was prepared by respondents' counsel, permanently enjoins the CDCR "from carrying out the execution of any condemned inmate by lethal gas" and "from carrying out the execution of any female inmate" unless and until regulations

---

[15] The provision of the Penal Code granting persons sentenced to death "the opportunity to elect to have the punishment imposed by lethal gas or lethal injection" (Pen. Code, § 3604, subd. (b)), is qualified by the proviso that "if either manner of execution . . . is held invalid, the punishment of death shall be imposed by the alternative means." (Pen. Code, § 3604, subd. (d).)

25

governing these matters "are drafted and approved following successful completion of the APA review and public comment process."

So far as the record shows, the CDCR has never indicated any intent to execute condemned inmates by means of lethal gas, or to execute female condemned inmates in any manner, before it has promulgated regulations pertaining to such executions that comply with the requirements of the APA. Indeed, in response to our inquiry, the CDCR has here specifically acknowledged that, under *Morales v. California Dept. of Corrections & Rehabilitation, supra*, 168 Cal.App.4th 729, it cannot execute condemned female inmates or carry out any executions by lethal gas without promulgating regulations regarding such executions that comply with that Act. Since these matters have never been placed at issue in this litigation, the trial court's comments regarding execution by means of lethal gas and the execution of female condemned inmates are gratuitous, as are the related provisions of paragraphs 4 and 5 of the judgment. This case is simply not among those in which the granting of injunctive relief is statutorily authorized. (Code Civ. Proc., § 526.)

## DISPOSITION

For the foregoing reasons, paragraphs 4 and 5 of the judgment are hereby vacated. The judgment is affirmed insofar as it declares that the CDCR's lethal injection protocol (Cal. Code Regs., tit. 15, §§ 3349-3349.4.6) is invalid for substantial failure to comply with the requirements of the APA, and permanently enjoins the CDCR from carrying out the execution of any condemned inmate by lethal injection unless and until new regulations governing lethal injection execution are promulgated in compliance with the APA.

Each party shall bear its own costs on appeal.

 

                                           _____

                                           Kline, P.J.

We concur:

_____

Lambden, J.

_____

Richman, J.

A135290, *Sims et al. v. California Department of Corrections and Rehabilitation, et al.*

Trial Court:                    Marin County Superior Court

Trial Judge:                    Honorable Faye D'Opal

Attorneys for Appellants:       Kamala Harris, Attorney General
                                Jonathan Wolff, Sr. Asst. Atty. General
                                Thomas S. Patterson, Super. Deputy A.G.
                                Mitchell J. Quinn, Deputy Attorney General

Attorneys for Respondents:      Arnold & Porter LLP
                                Steven L. Mayer
                                Julian Y. Waldo
                                Ginamarie Caya