**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JESSE JAMES ANDREWS,
   *Petitioner-Appellant*,

    v.

RON DAVIS, Acting Warden,
   *Respondent-Appellee.*

No. 09-99012

D.C. No.
2:02-CV-08969-R

---

JESSE JAMES ANDREWS,
   *Petitioner-Appellee*,

    v.

RON DAVIS, Acting Warden,
   *Respondent-Appellant.*

No. 09-99013

D.C. No.
2:02-CV-08969-R

OPINION

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted
January 12, 2015—Pasadena, California

Filed August 5, 2015

Before: Sandra S. Ikuta, N. Randy Smith,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Ikuta

## SUMMARY[*]

### Habeas Corpus/Death Penalty

The panel dismissed as unripe the sole claim certified by the district court for appeal, denied a motion to expand the certificate of appealability, and reversed the district court's grant of relief on an ineffective assistance of counsel claim in a case in which Jesse James Andrews challenges his conviction and capital sentence for three murders.

The panel reversed the district court's grant of relief on Andrews's claim that he was prejudiced by his counsel's failure to investigate and present additional mitigating evidence at the penalty phase of his trial, because, under 28 U.S.C. § 2254(d)(1), the California Supreme Court did not unreasonably apply Supreme Court precedent in concluding that Andrews was not prejudiced by any deficient performance.

Because California has no lethal injection protocol currently in place, the panel dismissed as unripe Andrews's certified claim that California's use of its lethal injection

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

protocol to execute him would violate his Eighth Amendment rights.

The panel denied Andrews's request to certify for appeal his uncertified claims of unconstitutional delay between sentencing and execution, ineffective assistance of counsel, failure to disclose material exculpatory evidence and false testimony, and destruction of evidence.

The panel held that the district court did not abuse its discretion in denying Andrews's motion for an evidentiary hearing.

## COUNSEL

Michael Burt (argued), Law Office of Michael Burt, San Francisco, California, for Petitioner-Appellant/Cross-Appellee.

Xiomara Costello (argued), Supervising Deputy Attorney General, Kamala D. Harris, Attorney General of California, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Keith H. Borjon, Supervising Deputy Attorney General, A. Scott Hayward, Deputy Attorney General, Sarah J. Farhat, Deputy Attorney General, Shira Seigle Markovich, Deputy Attorney General, Edward C. DuMont, Solicitor General, Gerald A. Engler, Chief Assistant Attorney General, Michael J. Mongan, Deputy Solicitor General, James William Bilderback II, Supervising Deputy Attorney General, Los Angeles, California, for Respondent-Appellee/Cross-Appellant.

## OPINION

IKUTA, Circuit Judge:

Jesse James Andrews appeals from the district court's denial of all but one of the claims raised in his petition for a writ of habeas corpus under 28 U.S.C. § 2254. The state cross-appeals the district court's grant of relief on Andrews's claim that his counsel's assistance was ineffective at the penalty phase of his capital murder trial. We dismiss as unripe the claim the district court certified for appeal, and deny Andrews's motion to expand the certificate of appealability to include uncertified claims. We reverse its grant of relief on the ineffective assistance claim because, under 28 U.S.C. § 2254(d)(1), the California Supreme Court did not unreasonably apply Supreme Court precedent in concluding that Andrews was not prejudiced by any deficient performance by his counsel.

I

A

On December 9, 1979, police were called to a Los Angeles apartment, where they found the bodies of three murder victims. *People v. Andrews*, 776 P.2d 285, 288 (Cal. 1989). The murder victims were Preston Wheeler, who lived in the apartment, Patrice Brandon, and Ronald Chism. *Id*. The California Supreme Court described the murder scene as follows:

> Wheeler had been stabbed in the chest six times and shot in the neck at close range with either a .32– or .357– caliber weapon. His

face and head were bruised, and his face had been slashed with a knife. Brandon and Chism had been strangled with wire coat hangers. Their faces were bruised, Chism's extensively. Brandon's anus was extremely dilated, bruised, reddened and torn, consistent with the insertion of a penis shortly before her death. There was also redness around the opening of her vagina, and vaginal samples revealed the presence of semen and spermatozoa. All three victims were bound hand and foot.

*Id*.

Approximately a year later, police arrested Charles Sanders in connection with the murders. *Id*. Sanders entered into a plea agreement, in which he pleaded guilty to three counts of second degree murder, admitted a gun enhancement, and agreed to cooperate with the prosecution, in exchange for a sentence of 17 years to life in prison. *Id*. During his interrogation by the police, Sanders gave both a tape-recorded and a written statement. *Id*. He also testified at Andrews's trial, and described the crime as follows:

Sanders testified that he and [Andrews] devised a plan to rob Wheeler, a drug dealer. [Andrews] armed himself with a .357 magnum and gave Sanders a .38–or .32–caliber automatic. On the evening of the murders, they visited their friend, Carol Brooks, who lived in the same apartment building as Wheeler, and then went to Wheeler's apartment. In response to their

knocking, Wheeler, who apparently knew [Andrews], let them in. Also inside the apartment was a woman (Patrice Brandon). After smoking some marijuana with Wheeler, [Andrews] and Sanders drew their guns. Sanders tied Wheeler and Brandon with belts and socks, put on a pair of gloves, and began to search the apartment for drugs and money. Except for some powder on a saucer which appeared to be cocaine, the search was unsuccessful. [Andrews] questioned Wheeler, who denied having any drugs or money. Saying he would make Brandon talk, [Andrews] dragged her into the kitchen and closed the door. Sanders remained in the living room with Wheeler.

Sanders heard [Andrews] hitting Brandon and later heard sounds as though they were having sex. When [Andrews] came out of the kitchen shortly thereafter, Sanders saw Brandon's pants around her ankles.

[Andrews] put his gun in Wheeler's mouth. He threatened to kill Wheeler and Brandon unless Wheeler revealed the location of the drugs. Wheeler said the 'dope' was in the attic, and pointed out a trap door leading up to it. Sanders climbed into the attic. While in the attic, Sanders heard two shots. When he came down, [Andrews] told him he had shot Wheeler because the latter had tried to jump out the window. Sanders asked if Wheeler was dead. [Andrews] responded he was

'standing right up' on Wheeler when he fired the gun . . . . When Sanders asked about Brandon, [Andrews] replied he had killed her before leaving the kitchen.

While [Andrews] and Sanders were cleaning up the apartment, Ronald Chism knocked on the door and asked if everything was all right. [Andrews] said Wheeler was home and invited him inside. [Andrews] then hit Chism on the head, tied him up, and took him into the bathroom. Sanders saw [Andrews] sitting astride Chism's back, joining and separating his clenched fists in a tugging motion, apparently strangling Chism. Sanders then saw [Andrews] go into the kitchen and choke Brandon with a wire clothes hanger. When the two left the apartment, [Andrews] gave Sanders some money, saying it was all he had found.

*In re Andrews*, 52 P.3d 656, 658 (Cal. 2002) (alterations, citations, and internal quotation marks omitted). Andrews was eventually arrested, and he was charged in June 1982.

At trial, the jury heard Sanders's testimony as well as the testimony of Carol Brooks. Brooks confirmed that Andrews and Sanders visited her on the night of the murders and told her about their plan to "get some money" from Wheeler. *People v. Andrews*, 776 P.2d at 289. A week after the incident, Sanders told her about his involvement in the murders. *Id*. Then, a few weeks later, Andrews confessed to her that he shot Wheeler, had sex with Brandon, and took $300 during the robbery. *Id*.

The prosecution also presented fingerprint evidence. *Id*. Police experts analyzed 50 prints lifted from the apartment; three prints belonged to Andrews. *Id*. One fingerprint was found on a coffee table in Wheeler's living room. *Id*. Two palm prints were found on the kitchen floor, on either side of the spot where Brandon's body was found, the left palm print being about a foot from her body.

The defense primarily focused on undermining Sanders's credibility. *Id*. Two jail inmates who had been incarcerated with Sanders testified. *Id*. They stated that, while Sanders was incarcerated with them, he made statements suggesting he planned to lie about the murders to shift blame onto Andrews and away from himself. *Id*.

The jury deliberated for three days before finding Andrews guilty of murder.[1] The jury also found three special circumstances to be true. Two special circumstances related to the offense conduct: (1) multiple murder and robbery murder, based on the murders of Wheeler, Brandon, and Chism, and the robbery of Wheeler, and 2) rape-murder, based on the rape and murder of Brandon. *In re Andrews*, 52 P.3d at 659. The third special circumstance was Andrews's conviction for murder of a grocery store clerk in 1967. *Id.*

Both the prosecutor and defense counsel made brief presentations at the penalty phase. The prosecutor presented evidence through a joint stipulation. *Id*. He noted that the jury had already found that Andrews had been convicted of murder in 1967. The parties also stipulated that Andrews had

---

[1] Andrews was convicted after his second trial, because the jury failed to reach a verdict in the first trial.

been convicted of armed robbery in May 1968, that he had been convicted of escape in November 1969, and that he had been convicted of robbery in June 1977. *Id*. The stipulation did not describe the facts of the offenses underlying these additional convictions. The prosecution also submitted photographs of the dead bodies of Patrice Brandon and Ronald Chism as they were found by the police in the apartment; the photos had been excluded at the guilt phase on the ground they were unduly inflammatory. *Id*. Finally, the parties stipulated that Andrews's birth date was July 2, 1950. *Id*.

The defense evidence consisted of two sworn statements that were read to the jury. *Id*. The statements described facts underlying the incident in September 1966 that formed the basis of Andrews's 1967 conviction for murder. According to the statements, Andrews and a 17-year-old companion, both of whom were armed, attempted to rob a grocery store, and the companion fired three shots, killing the grocery store clerk. *Id*.

In his closing argument, defense counsel focused on mitigating circumstances. He argued that Andrews's crimes were unsophisticated, occurred several years apart, and all involved the unexpected escalation of a planned robbery. *Id*. He pointed out that Andrews was only 15 years old at the time of the murder of the grocery store clerk, and was not the shooter. *Id*. He portrayed Andrews's conduct as less blameworthy because the murders occurred while Andrews, Sanders, Wheeler, and Brandon were under the influence of illegal drugs. *Id*. at 659–60. Finally, he emphasized that other murderers had received life without the possibility of parole despite the jury's finding of special circumstances, and despite more blameworthy conduct. *Id*. at 659. He pointed

out that in this very case, Sanders received a sentence of only 17 years to life. *Id.* at 660. The prosecution made no rebuttal.

After one day of deliberations, the jury returned a verdict imposing the death penalty for each of the three murder counts. The court sentenced Andrews to death on the three counts on June 8, 1984. The California Supreme Court affirmed the conviction and sentence on direct appeal on August 3, 1989. *People v. Andrews*, 776 P.2d at 285, 288.

B

Andrews filed petitions for state post-conviction relief, claiming, among other things, that his counsel's assistance was ineffective at the penalty phase because counsel did not adequately investigate and present mitigating evidence. The California Supreme Court summarily denied all of Andrews's claims, except for his penalty phase ineffective assistance of counsel claim.

The California Supreme Court appointed a referee to take evidence and make factual findings on six questions related to Andrews's penalty phase ineffective assistance of counsel claim. *In re Andrews*, 52 P.3d at 659. Two of the six questions are relevant to the question of whether Andrews was prejudiced by his counsel's allegedly ineffective assistance: "1. What mitigating character and background evidence could have been, but was not, presented by [Andrews]'s trial attorneys at his penalty trial?" *id.* at 660, and "5. What evidence, damaging to [Andrews], but not presented by the prosecution at the guilt or penalty trials, would likely have been presented in rebuttal, if [Andrews] had introduced any such mitigating character and background

evidence?" *id.* at 664.[2]  The referee received the testimony of over 50 witnesses, which took place over the span of six years, *id.* at 660, and issued a lengthy written report of her findings.

The California Supreme Court denied Andrews's penalty phase ineffective assistance of counsel claim in a lengthy opinion. *Id.* at 656–76.  In its opinion, the court summarized the referee's findings.  In response to the first question, the referee identified three broad categories of mitigating evidence that were available but not presented to the jury: Andrews's family background; the conditions of his confinement in a juvenile reform school and in the Alabama prison system; and his mental health.  *Id.* at 660.  As summarized in the court's opinion, the referee's report included the following information regarding Andrews's

---

[2] The other four questions were:

> 2. What investigative steps by trial counsel, if any, would have led to each such item of information?
>
> 3. What investigative steps, if any, did trial counsel take in an effort to gather mitigating evidence to be presented at the penalty phase?
>
> 4. What tactical or financial constraints, if any, weighed against the investigation or presentation of mitigating character and background evidence at the penalty phase? . . .
>
> 6. Did [Andrews] himself request that either the investigation or the presentation of mitigating evidence at the penalty phase be curtailed in any manner? If so, what specifically did [Andrews] request?

*In re Andrews*, 52 P.3d at 659.

background. When he was very young, Andrews's alcoholic parents separated, and his mother left him to be raised by his grandparents and aunt, in a large family home with his siblings and cousins, located in a poor, segregated neighborhood of Mobile, Alabama. *Id*. The referee described Andrews's grandfather as "loving, benevolent, and responsible," *id.*, and the court added that Andrews's mother regularly sent money and clothing to her children and that Andrews's upbringing and early family life were "relatively stable and without serious privation or abuse," *id.* at 670. When Andrews was around nine or ten, his mother returned home to stay. *Id.* at 660, 670. She had children by another marriage, of whom Andrews was jealous. *Id.* at 660. Around that time Andrews's grandfather, a "pivotal figure" in his life, died. *Id.* (internal quotation marks omitted). Andrews became withdrawn, skipped school, and at age 14, committed car theft and was sent to a reform school known as Mt. Meigs, formally the Alabama Industrial School for Negro Children. *Id*.

The conditions at Mt. Meigs, described succinctly by the state court as "appalling," included "beatings, brutality, inadequate conditions and sexual predators." *Id.* at 660–61 (internal quotation marks omitted). According to the referee's report, one witness described it as "a farming operation and a penal colony for children," while others described "inhuman conditions, inadequate food and clothing and severe beatings," with "sticks, broom handles, tree limbs, and hoe handles . . . or fan belts." Andrews was released at age 16. *Id.* at 661.

Within three months of his release, in September 1966, he and a companion were involved in the attempted robbery and murder of the grocery store clerk that became one of the three

special circumstances in this capital case. *See supra* at 9; *In re Andrews*, 52 P.3d at 661. The evidence showed that when Andrews and his companion were fleeing the scene in a taxi, they robbed the taxi driver at gunpoint. *In re Andrews*, 52 P.3d at 661. The taxi driver testified he heard Andrews say "[l]et's shoot him." *Id.* at 665 (internal quotation marks omitted). Andrews then fired at least two shots at the taxi driver. *Id*. In 1967, Andrews was convicted of murder based on the grocery store incident, and in 1968, he was convicted of armed robbery of the taxi driver. *Id.* at 661 n.4. Just before he turned 18, he was committed to Alabama state prison. *Id.* at 661.

Summarizing the referee's findings about conditions in the four different prisons in which Andrews was confined over ten years, the California Supreme Court stated:

> [The referee] described conditions in these institutions as abysmal, characterized by severe overcrowding, racial segregation, substandard facilities, no separation of the tougher inmates from younger or smaller inmates, constant violence, the persistent threat of sexual assaults and the constant presence of sexual pressure, the availability and necessity of weapons by all inmates, and degrading conditions in disciplinary modules. [Andrews] not only received beatings but was also personally subjected to sexual assaults.

*Id*. (internal quotation marks omitted).

The court also noted that Andrews had been involved in prison violence, including "the stabbings of two inmates who

had been threatening him." *Id*. (internal quotation marks omitted). However, Andrews "was rarely the instigator of violence," was "the prey rather than the predator" when he was involved, and was often a target of violence due to his small stature. *Id*. at 662 (internal quotation marks omitted). He also "appeared to adjust well when the structure permitted and . . . would continue to do so" and, "when circumstances permitted, he tended to hold positions of responsibility." *Id*.

After his release from prison in 1976, Andrews engaged in an attempted robbery of a laundry. *Id.* at 661. In this incident:

> Mobile Police Officer Pettis testified that on March 23, 1977, he responded to a robbery call. Entering the store from which the call came, he and other officers saw [Andrews] holding a crying young woman hostage with a cocked gun at her head. He told the officers to leave and "continued to repeat, 'Someone's going to get shot, I'm going to shoot.'" The officers withdrew. Ultimately, [Andrews] surrendered to the officers after releasing the young woman and another woman whom he had also held hostage.

*Id*. at 665. Andrews was arrested for the robbery, but escaped from jail and fled to California. *Id.* at 661.

In California, Andrews met Debra Pickett, with whom he had a stable relationship. *Id.* The couple had a child, and Andrews held a job during this time. *Id.* But Andrews resumed using cocaine, left his job and family, and then committed the three murders at issue here. *Id.*

The referee also described the testimony from mental health experts that could have been presented at the penalty phase. Summarizing the referee's report, the California Supreme Court noted that the experts diagnosed Andrews with a range of mental disorders, including attention deficit disorder, post traumatic stress disorder (PTSD), and mild to moderate organic brain impairment, in part due to drug use and possibly due to a head injury in prison. *Id.* The experts opined that Andrews's learning disability, the adverse circumstances of his childhood, the impact of the correctional systems, and the PTSD made his commission of the murders and sexual assault more understandable and less morally culpable. *Id.* at 661–62. The experts gave specific examples of how Andrews's impairments and the brutal conditions of incarceration made it difficult for him to avoid getting into trouble with the law. *Id.* at 661–62, 670. For example, one psychiatrist testified that one of the victims had hurled an insulting slur at Andrews a few days before the murders, and Andrews's PTSD would predispose him to overreact to the slur, which contributed to the expert's conclusion that Andrews was "under the influence of extreme mental or emotional distress" when he committed the murders.

In addressing the question whether the prosecutor would have introduced evidence damaging to Andrews in rebuttal, the referee found that the prosecution's rebuttal presentation could have included evidence about two of Andrews's prior convictions.[3] *Id.* at 664–65. First, during the penalty phase

---

[3] Andrews argued that the prosecutor testified he would not have put on additional evidence, but the California Supreme Court rejected this argument, finding that presentation of the mitigating evidence would have prompted the prosecutor to shift the focus of his penalty phase case, put

of Andrews's trial, the jury was reminded of its special circumstance finding, that Andrews had been convicted of murder in 1967 for his involvement in the grocery store robbery-murder in 1966. It also heard that Andrews was convicted of robbery in 1968, but it did not hear the facts on which the conviction was based, such as evidence that Andrews shot at the driver of the get-away taxi, which could have been introduced as aggravating evidence. *Id.* at 659, 664. The prosecution could have introduced that evidence to show Andrews's greater moral culpability for the incident. *Id.* at 664. Second, the prosecution could have informed the jury about Andrews's attempt to rob a laundry business following his release from prison in 1976, which involved holding two women hostage, one with a gun to her head. *Id*. at 661, 665.

Further, the referee determined that the prosecution could have called its own mental health experts to rebut Andrews's evidence. *Id*. at 665. The state could have presented expert testimony that Andrews did not suffer from PTSD, but rather suffered from antisocial personality disorder, resented authority, and had a normal-range IQ of 93. *Id*. A second expert would have testified that Andrews's ability to hold a job and maintain a stable relationship with Debra Pickett before he committed the murders indicated he did not suffer from brain damage, and the planning and thought that went into the murders made it unlikely that he was under the influence of drugs at the time. *Id*.

After recounting the referee's findings on these questions as well as the other four questions, and resolving objections

---

on additional witnesses, and use cross-examination and closing argument to further damage Andrews's mitigation case. *Id*. at 665–66.

to the referee's report, the California Supreme Court turned to its analysis of Andrews's ineffective assistance of counsel claim. *Id*. at 667. It held that Andrews's counsel's performance was not deficient during the penalty phase of the trial because Andrews's counsel made a reasonable investigation, under then-existing professional norms and Supreme Court precedent, and counsel also made a reasonable decision not to conduct additional investigation. *Id*. 667–71. It then held that even if counsel's performance were deficient, Andrews suffered no prejudice because a different result was not reasonably probable in light of the severity of his crimes, the fact that the jury might view some of his mitigating evidence as aggravating, and the substantial rebuttal evidence that could have been presented. *Id*. at 671.

Andrews filed a habeas petition in federal district court. His amended petition raised 32 claims, including multiple subclaims. In a lengthy ruling on the merits of the petition, the district court denied 31 claims, but granted relief on the claim that Andrews's counsel were ineffective at the penalty phase of his trial for failing to investigate and present additional mitigating evidence. Reviewing the evidence produced by the referee on this issue, the district court concluded that counsel had made "essentially no effort to investigate and put on evidence in mitigation," which constituted deficient performance under *Strickland*. The court then ruled that counsel's "failure to adequately investigate and discover evidence of a life filled with abuse and privation is sufficient to establish prejudice under *Strickland*," but the court did not consider whether the California Supreme Court's rejection of this ineffective assistance of counsel claim was "contrary to, or involved an unreasonable application of" *Strickland* under 28 U.S.C. § 2254(d)(1). The court granted Andrews's petition on this

ineffective assistance of counsel claim, denied Andrews's other 31 claims, and granted a certificate of appealability (COA) on Andrews's claim that California's lethal injection protocol violates the Eighth Amendment (Claim 25).

Andrews timely appealed, challenging the district court's denial of Claim 25 and the denials of several uncertified claims. The state cross-appealed the district court's grant of relief on Andrews's ineffective assistance of counsel claim. After briefing on his appeal was complete, Andrews moved for permission to brief an additional uncertified claim, in which he seeks habeas relief on the ground that it would violate the Eighth Amendment to execute him after a long delay from the date of his sentencing. We granted the motion.

II

We review a district court's grant or denial of habeas relief de novo. *Moses v. Payne*, 555 F.3d 742, 750 (9th Cir. 2009).

A

The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to Andrews's federal habeas petition, which was filed after April 24, 1996. *See Lindh v. Murphy*, 521 U.S. 320, 322, 336 (1997). Under AEDPA, a court may not grant a habeas petition "with respect to any claim that was adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d), unless the state court's judgment "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,"

§ 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).**[4]**

Under § 2254(d)(1), the relevant Supreme Court precedent includes only the decisions in existence "as of the time the state court renders its decision." *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011) (internal quotation marks and emphasis omitted); *see also Cullen v. Pinholster*, 131 S. Ct. 1388, 1399 (2011) ("State-court decisions are measured against [the Supreme] Court's precedents as of the time the state court renders its decision." (internal quotation marks omitted)). Thus, Supreme Court cases decided after the state court's decision are not clearly established precedent under § 2254(d)(1) for purposes of evaluating whether the state court reasonably applied such precedent.

A Supreme Court precedent is not clearly established law under § 2254(d)(1) unless it "squarely addresses the issue" in the case before the state court, *Wright v. Van Patten*, 552 U.S. 120, 125–26 (2008) (per curiam), or "establish[es] a legal principle that 'clearly extends'" to the case before the state court, *Moses*, 555 F.3d at 754 (alterations omitted) (quoting *Van Patten*, 552 U.S. at 123); *see also Carey v. Musladin*, 549 U.S. 70, 76–77 (2006) (holding that Supreme Court cases evaluating state-sponsored courtroom conduct were not clearly established law governing private actor courtroom conduct). "[W]hen a state court may draw a principled

---

**[4]** Neither party disputes that the claims in this case were "adjudicated on the merits" by the California Supreme Court, and that its decision constitutes the "last reasoned decision" of the state court with respect to those claims. *See Cheney v. Washington*, 614 F.3d 987, 993, 995 (9th Cir. 2010).

distinction between the case before it and Supreme Court caselaw, the law is not clearly established for the state-court case." *Murdoch v. Castro*, 609 F.3d 983, 991 (9th Cir. 2010). "[I]f a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision." *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (internal quotation marks omitted). A principle is clearly established law governing the case "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question." *Id.* at 1706–07 (internal quotation marks omitted).

A state court decision is "contrary to" Supreme Court precedent if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). An "unreasonable application" of Supreme Court precedent is not one that is merely "incorrect or erroneous," *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *see also Williams*, 529 U.S. at 410; rather, "[t]he pivotal question is whether the state court's application of the [relevant Supreme Court precedent] was *unreasonable*," *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (emphasis added). If "'fairminded jurists could disagree' on the correctness of the state court's decision," that decision is not unreasonable. *Id.* at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). A state court summary denial is an "unreasonable application" of Supreme Court precedent only if "there was no reasonable basis," *id.* at 98, for the decision in light of the "arguments or theories [that] . . . could have supported[] the state court's decision," *id.* at 102.

The Supreme Court has made clear that § 2254(d) sets forth a "highly deferential standard[,] . . . which demands that state-court decisions be given the benefit of the doubt." *Pinholster*, 131 S. Ct. at 1398 (internal quotation marks omitted). "As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings," but only "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents" and "goes no further." *Richter*, 562 U.S. at 102. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* In a nutshell, "[i]f this standard is difficult to meet, that is because it was meant to be." *Id.* at 102.

## B

The clearly established federal law for ineffective assistance of counsel claims, as determined by the Supreme Court, is *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny. *See Pinholster*, 131 S. Ct. at 1403. *Strickland* concluded that, under the Sixth Amendment, the accused has the right to the effective assistance of counsel at trial and during capital sentencing proceedings. 466 U.S. at 684–87. A petitioner claiming ineffective assistance of counsel must prove: (1) that "counsel's performance was deficient," and (2) that "the deficient performance prejudiced the defense." *Id.* at 687. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697. Rather, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course

should be followed." *Id.* In short, a court need not address the two *Strickland* prongs in order; if ruling on the prejudice prong more efficiently resolves the case, reaching the deficiency prong is unnecessary. *Id.*

In determining whether a state court's adjudication of an ineffective assistance of counsel claim was an unreasonable application of Supreme Court precedent, we may consider how the Supreme Court itself has applied *Strickland* to other factual contexts, but this is merely "illustrative of the proper application of [*Strickland*'s] standards." *See Wiggins v. Smith*, 539 U.S. 510, 522 (2003); *see also Pinholster*, 131 S. Ct. at 1407 n.17; Brian R. Means, *Federal Habeas Manual* § 3:29 (2014). The Supreme Court has warned us not to derive "strict rules" from its cases applying *Strickland* de novo because "the *Strickland* test 'of necessity requires a case-by-case examination of the evidence.'" *Pinholster*, 131 S.Ct. at 1407 & n.17 (quoting *Williams*, 529 U.S. at 391). Further, Supreme Court cases decided on de novo review "offer no guidance with respect to whether a state court has *unreasonably* determined that prejudice is lacking" or defense counsel was deficient, and so are not directly applicable to a federal court's review under § 2254(d)(1) of a habeas petitioner's claim that a state court unreasonably applied *Strickland*. *Id.* at 1411. Indeed, a state court's application of *Strickland* may be objectively reasonable based on clearly established Supreme Court precedent at the time of its decision even if the Supreme Court's subsequent applications of *Strickland* suggest a different result. By contrast, when the Supreme Court addresses the AEDPA question whether a state court's adjudication of an ineffective assistance of counsel claim was an unreasonable application of *Strickland*, its reasoning guides a federal court's AEDPA analysis regardless of when the opinion was issued.

The Supreme Court has provided guidance for applying *Strickland* to determine whether counsel's "deficient performance prejudiced the defense," *Strickland*, 466 U.S. at 687, at the penalty phase of a capital case. To make this prejudice determination, a court generally proceeds through three steps: (1) evaluating and weighing the totality of the available mitigation evidence, *see Williams*, 529 U.S. at 397–98; *Pinholster*, 131 S. Ct. at 1408–10; (2) evaluating and weighing the aggravating evidence and any rebuttal evidence that could have been adduced by the government had the mitigating evidence been introduced, *Williams*, 529 U.S. at 397–98; *Pinholster*, 131 S.Ct. at 1408–10, and (3) reweighing the evidence in aggravation against the totality of available mitigating evidence, *see Sears v. Upton*, 561 U.S. 945, 955–56 (2010) (per curiam); *Wiggins*, 539 U.S. at 534; *Williams*, 529 U.S. at 397–98, to determine "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death," *Strickland*, 466 U.S. at 695. We explain the Supreme Court's guidance on each of these steps.

1

The first step in determining whether counsel's deficient performance prejudiced the defendant at the penalty phase is evaluating "the totality of the available mitigation evidence." *Williams*, 529 U.S. at 397–98. The evidence to be evaluated includes both evidence that was actually presented at sentencing and evidence that a competent attorney would have introduced. *See Wiggins*, 539 U.S. at 534–35. We may assume that a competent attorney would have considered presenting all of the evidence adduced in post-conviction

proceedings.  *See Wong v. Belmontes*, 558 U.S. 15, 20 (2009) (per curiam).

Mitigation evidence is a broad category, as a jury must be permitted to consider all relevant mitigating factors.  *Lockett v. Ohio*, 438 U.S. 586, 608 (1978) (plurality opinion); *Eddings v. Oklahoma*, 455 U.S. 104, 110–12 (1982).  The Supreme Court has identified several non-exclusive categories of mitigation evidence, focusing primarily on evidence that aids the jury's evaluation of a defendant's moral culpability.  *See Wiggins*, 539 U.S. at 535.  For instance, evidence of a defendant's disadvantaged background may lead a jury to conclude the defendant is "less culpable than defendants who have no such excuse."  *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal quotation marks omitted), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).  Thus, a defendant who had a childhood "filled with abuse and privation," including being raised by parents who were eventually imprisoned for criminal child neglect, could influence a jury's appraisal of the defendant's moral culpability.  *Williams*, 529 U.S at 395, 398; *see also Wiggins*, 539 U.S. at 535 (mitigating evidence included evidence that the defendant suffered severe privation and abuse as a child, had an alcoholic and absent mother, was physically and sexually abused in foster care, and was homeless for a brief period); *Rompilla v. Beard*, 545 U.S. 374, 391–93 (2005) (mitigating evidence included evidence that the defendant was raised in a slum by severely abusive, alcoholic parents, who did not provide for him and isolated him).

Similarly, evidence of a defendant's mental or emotional difficulties may lead a jury to conclude that a defendant is less culpable than defendants without such difficulties.

*Penry*, 492 U.S. at 319. For instance, evidence that a defendant is "borderline mentally retarded," *Williams*, 529 U.S. at 396 (internal quotation marks omitted), or has severe PTSD from military combat, *see Porter v. McCollum*, 558 U.S. 30, 35–36 & n.4, 43–44 (2009), or has severe learning and behavioral disabilities, frontal lobe injuries, and brain damage from drug and alcohol abuse, *see Sears*, 561 U.S. at 948–49, is potentially mitigating evidence.

Evidence of conduct or behavior demonstrating the defendant's good character may also be mitigating. In *Williams*, the Court gave weight to evidence that the defendant had turned himself in, alerted police to a previously undetected crime, expressed remorse, cooperated with police, and behaved well in prison. 529 U.S. at 369, 396, 398. In *Belmontes*, the Court noted mitigation evidence that the defendant had maintained strong relationships with family members in spite of his terrible childhood, and that while in prison, he assisted others through a prison religious program and rose to second in command in a fire crew. 558 U.S. at 21.

After identifying the evidence that the petitioner claims to be mitigating, a court must weigh its strength by assessing its likely impact on a jury. This weighing process includes evaluating whether its impact on the jury might be aggravating rather than mitigating. *See Pinholster*, 131 S. Ct. at 1410. The Supreme Court has indicated that courts can consider the fact that mitigation "may be in the eye of the beholder," and juries may find that some evidence offered as mitigation cuts the other way. *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (alterations and internal quotation marks omitted). In *Burger*, the Court noted that "[o]n one hand, a jury could react with sympathy over the tragic childhood" of the

defendant, while on the other hand, the same testimony could establish the defendant's "unpredictable propensity for violence" that resulted in murder. *Id.* (internal quotation marks omitted). Similarly, evidence of mental and emotional problems might suggest an increased likelihood that a defendant would be dangerous in the future. *See Pinholster*, 131 S. Ct. at 1410 (noting that evidence of the defendant's family background, their substance abuse, and their mental health issues, was "by no means clearly mitigating, as the jury might have concluded that [the defendant] was simply beyond rehabilitation"). The Court has also observed that evidence of the defendant's normal youth might, in the jury's eyes, establish greater moral culpability on the part of the defendant. *See Bell v. Cone*, 535 U.S. 685, 701–02 (2002).

2

The second step in determining whether counsel's deficient performance prejudiced the defendant at the penalty phase is evaluating the weight of the aggravating evidence and any rebuttal evidence that could have been adduced by the government had the mitigating evidence been introduced. *See Williams*, 529 U.S. at 397–98; *Pinholster*, 131 S. Ct. at 1408–10. Aggravating evidence may include evidence relating to the circumstances of the crime. Thus in *Strickland*, the Court found the aggravating evidence to be "overwhelming" where the defendant had repeatedly stabbed the three murder victims during a robbery. 466 U.S. at 674, 700. Similarly, where the record showed that the defendant had bludgeoned a woman to death with 15 to 20 blows of a steel dumbbell bar to steal goods worth a mere $100, the Supreme Court agreed with the state court that the aggravating evidence was "simply overwhelming" and determined that counsel's failure to introduce certain

mitigating evidence was not prejudicial. *Belmontes*, 558 U.S. at 15–16, 26–27 (internal quotation marks omitted). In *Bobby v. Van Hook*, the Supreme Court gave weight to evidence that the murder was committed in the course of a scheme to rob homosexual men by luring them into secluded settings. 558 U.S. 4, 12–13 (2009) (per curiam). In doing so, the Court clarified that the weight, not the number, of the aggravating factors was important. *Id.*

Evidence about a defendant's prior criminal history is also aggravating and can be introduced in rebuttal, and a severe criminal history carries great weight. *See Woodford v. Visciotti*, 537 U.S. 19, 26–27 (2002) (criminal history that included "the knifing of one man, and the stabbing of a pregnant woman as she lay in bed trying to protect her unborn baby," combined with the circumstances of the crime, was "overwhelming" and "devastating" aggravating evidence); *accord Bell*, 535 U.S. at 700 & n.5 (defense counsel reasonably feared the prosecution would elicit information about defendant's criminal history, which included robberies, in rebuttal); *Burger*, 483 U.S. at 793 (defense counsel reasonably feared the prosecution would introduce the defendant's juvenile criminal history in rebuttal, when he had a clean adult record). Evidence that a defendant had previously committed another murder may be "the most powerful imaginable aggravating evidence." *Belmontes*, 558 U.S. at 28 (internal quotation marks omitted).

Rebuttal evidence may also directly undermine the value of the mitigation evidence. For example, the Supreme Court noted in *Pinholster* that it would be "of questionable mitigating value" for defense counsel to introduce expert testimony diagnosing a defendant with bipolar mood disorder and seizure disorders, because such evidence would invite

rebuttal by a state expert, who could reject the diagnosis of bipolar disorder and offer a different diagnosis of antisocial personality disorder. *Pinholster*, 131 S. Ct. at 1396, 1410.

3

Finally, the third step in determining whether counsel's deficient performance prejudiced the defendant at the penalty phase is to "reweigh the evidence in aggravation against the totality of available mitigating evidence," *Wiggins*, 539 U.S. at 534, in order to determine "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death," *Strickland*, 466 U.S. at 695. A "reasonable probability" is a level of probability that "undermine[s] confidence in the outcome." *Id.* at 694. However, counsel's deficient performance is not prejudicial merely because the court cannot "rule out" the possibility that the sentencer would have imposed a sentence of life in prison instead of the death penalty. *Belmontes*, 558 U.S. at 20, 27 (internal quotation marks omitted); *see also Richter*, 562 U.S. at 111 ("In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome . . . ."). Rather, "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693). Thus, "the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" *Id.* (quoting *Strickland*, 466 U.S. at 697).

The Court has found a reasonable probability of a different outcome when only scant and weak aggravating evidence could have been presented in rebuttal to strongly

mitigating evidence.  *See Wiggins*, 539 U.S. at 534–36, 537–38 (holding that there was a reasonable probability that the jury would have reached a different result at sentencing had it heard powerful mitigating evidence regarding the defendant's childhood background, when the state could have presented only weak rebuttal evidence).  By contrast, the Court has found no prejudice when the aggravating evidence is overwhelming, even though the mitigating evidence is strong.  *See Visciotti*, 537 U.S. at 26–27 (holding that there was no reasonable probability of a different result when the mitigating evidence, including the defendant's "troubled family background" and possible seizure disorder, did not outweigh the "overwhelming" aggravating factors, including the circumstances of the crime and potential rebuttal evidence of prior offenses).

In reweighing aggravating and mitigating evidence, the Court has also examined whether mitigating evidence would be merely cumulative or would have significantly altered the information provided to the sentencer.  *See Strickland*, 466 U.S. at 699–700; *Porter*, 558 U.S. at 41–42.  In *Strickland*, the new information "would barely have altered" the picture presented at sentencing, and the Court found no prejudice. 466 U.S. at 699–700.  Similarly, in *Belmontes*, the Court concluded that merely cumulative evidence regarding a petitioner's difficult childhood, and expert testimony regarding a petitioner's mental state "seeking to explain his behavior, or putting it in some favorable context" would not outweigh the facts of a brutal murder, and would be even less likely to outweigh evidence that the defendant had committed a prior murder.  558 U.S. at 22–24, 27–28.  Accordingly, the Court concluded that any failure of counsel to present additional mitigating evidence was not prejudicial.  *Id.* at 27.

These Supreme Court opinions suggest that under *Strickland*'s prejudice prong, cumulative mitigating evidence does not support a conclusion that there would be a reasonable probability of a different outcome. New mitigating evidence can support such a conclusion only if it is sufficiently strong, and the known or additional aggravating evidence is not overwhelming.

C

In light of this guidance, we now evaluate the California Supreme Court's rejection of Andrews's claim that he was prejudiced by his counsel's failure to investigate and present additional mitigating evidence at the penalty phase of his trial. We must determine whether this decision was "contrary to, or involved an unreasonable application of," *Strickland* or other Supreme Court precedent in existence at the time of its opinion. § 2254(d)(1); *see Pinholster*, 131 S. Ct. at 1399.

In considering whether any deficiency by Andrews's counsel was prejudicial, the California Supreme Court correctly followed *Strickland* in asking whether, even if counsel was deficient, Andrews's defense was not prejudiced by any such deficiency because a different result was not reasonably probable.[5]  *See In re Andrews*, 52 P.3d at 671

---

[5] Andrews argues that the state court failed to apply the correct legal standard established in *Tennard v. Dretke*, 542 U.S. 274 (2004) and *Smith v. Texas*, 543 U.S. 37 (2004), because it dismissed Andrews's mitigating evidence on the ground that the evidence was not unambiguously mitigating, and implied that there must be some connection between the mitigating evidence not introduced at the penalty phase and the crimes. We disagree. *Tennard* and *Smith* require a sentencer to have the opportunity to consider and give effect to all relevant mitigating evidence, but do not specify what weight the sentencer must give such evidence.

(quoting *Strickland*, 466 U.S. at 694).   The California Supreme Court then reasonably carried out the three steps indicated by Supreme Court opinions for evaluating prejudice at the penalty phase.

1

The court first considered the totality of the mitigating evidence presented at trial, as well as what mitigation could have been presented by a competent attorney, based on the six-year review and report by the referee.  *See Williams*, 529 U.S. at 397–98.  The court reviewed all of the mitigating evidence that Andrews presented, including Andrews's family background, *In re Andrews*, 52 P.3d at 660, 670, incarceration in Mt. Meigs and in Alabama prisons,[6] *id.* at

---

*See Eddings*, 455 U.S. at 114–15 ("The sentencer . . . may determine the weight to be given relevant mitigating evidence. But [courts] may not give it no weight by excluding such evidence from their consideration."). Here, the California Supreme Court correctly considered all mitigating evidence before weighing its likely effect on a jury.  *See Pinholster*, 131 S. Ct. at 1410.

[6] Andrews's claim that the state court failed to consider his experiences at Mt. Meigs, is not supported by the record.  The state court detailed Andrews's experiences at Mt. Meigs when discussing mitigating evidence that could have been presented, noting that "[a]t Mt. Meigs, [Andrews] encountered appalling conditions" and detailing the referee's findings that Andrews was "was subjected to beatings, brutality, inadequate conditions and sexual predators," that "[h]is passiveness and small physique caused him to be a target of older, tougher boys, from whom no protection or separation was provided," and that "Mt. Meigs failed to provide any meaningful rehabilitative or educational opportunities."  *In re Andrews*, 52 P.3d at 660–61 (internal quotation marks omitted).  The state court also noted that expert testimony would have addressed his drug use at Mt. Meigs.  *Id.* at 661.  Moreover, the state court's use of the term "prison

660–61, 670–71, and mental health evidence, *id.* at 661–62, 670, observing that the similar types of mitigating evidence have been considered in Supreme Court precedent, *id.* at 672–75; *see Penry*, 492 U.S. at 319; *Williams*, 529 U.S. at 395–98.

The California Supreme Court then evaluated the strength of this mitigating evidence by considering, among other things, whether it might be viewed by a jury as aggravating. *See Burger*, 483 U.S. at 793; *Pinholster*, 131 S. Ct. at 1410. It reasonably concluded that much of the evidence identified as mitigating "was not conclusively and unambiguously mitigating," and it evaluated the possibility that the evidence could be rebutted or used to Andrews's disadvantage, or that cross examination might "deflate the mitigating impact" of the evidence. *In re Andrews*, 52 P.3d at 670 & n.9. The court reasonably observed that a jury could have determined that Andrews's family background did not reduce his moral culpability, given that Andrews was raised in a non-abusive, stable family situation. *Id.* at 670; *cf. Bell*, 535 U.S. at 701–02 (suggesting that evidence of a normal youth might "cut the other way"). The court reasonably concluded that "[Andrews] did not suffer a home environment that would place his crimes in any understandable context or explain his resorting to crime every time he was released or escaped from prison." *Id.* at 670.

In addition, the state court reasonably determined that the evidence regarding the prison conditions was double-edged. On the one hand, the prison conditions evidence left it in "no doubt [that Andrews] endured horrifically demeaning and

conditions" in its opinion is consistent with its use in the referee's report, where the term referred to conditions both in prison and Mt. Meigs.

degrading circumstances." *Id.* On the other hand, the evidence would be presented primarily through the testimony of Andrews's former fellow inmates, who had serious criminal records that could "draw[] an unfavorable comparison" with Andrews. *Id.* at 671. "Many had themselves engaged in brutality while in prison and escaped with some frequency," also similar to Andrews. *Id.* Moreover, no matter how the prison conditions evidence was presented, "[r]ather than engendering sympathy, the evidence could well have reinforced an impression of him as a person who had become desensitized and inured to violence and disrespect for the law."[7] *Id.*; *cf. Pinholster*, 131 S. Ct. at 1410.

2

After assessing the weight of the mitigating evidence and its likely impact on a jury, the state court followed Supreme Court guidance by turning to evaluate the weight of the aggravating evidence at trial, as well as any additional rebuttal evidence that could have been introduced. *See Williams*, 529 U.S. at 397–98; *Belmontes*, 558 U.S. at 20, 24–28. Consistent with Supreme Court precedent, the state court considered the circumstances of Andrews's crime and the nature of his prior criminal history. Turning to the circumstances of the crimes, the state court stated that the murders showed a "callous disregard for human life." *In re*

---

[7] Andrews argues that the state court made an unreasonable determination of the facts, *see* § 2254(d)(2), in holding that the prison conditions evidence could be aggravating. We reject this argument, because the state court's conclusion is a reasonable application of the prejudice standard elaborated by *Strickland* and its progeny, not a factual finding. *Cf. Pinholster*, 131 S. Ct. at 1410.

*Andrews*, 52 P.3d at 671; *cf. Strickland*, 466 U.S. at 674, 700; *Belmontes*, 558 U.S. at 15, 26–27. Andrews did not impulsively react to a situation that got out of hand; rather, he interacted with the victims in a calm and normal manner before torturing and killing them. *In re Andrews*, 52 P.3d at 671. He also did more than simply kill the victims. He raped and sodomized Brandon before murdering her, and he also murdered Wheeler and Chism with "considerable violence and evident sangfroid." *Id.* The state court also considered that, as rebuttal evidence, the prosecution could have presented the details of Andrews's criminal history, *cf. Bell*, 535 U.S. at 700 & n.5; *Burger*, 483 U.S. at 793, from which the jury might conclude Andrews was "aggressive and desensitized to violence," *In re Andrews*, 52 P.3d at 669. The jury might also have concluded that this "pattern of criminality" showed Andrews "would pose a danger to others if he were sentenced to life imprisonment."[8] *Id.* Also, the

---

[8] Andrews argues that the state court's conclusion that the evidence gave rise to the inference of future dangerousness was an unreasonable determination of the facts. He argues that the prison stabbings, laundry robbery, and conditioning to violence during his prison experiences do not support such an inference, pointing to mitigating facts found by the referee, including that in some incidents, Andrews was defending himself against inmates who had been threatening him. We disagree. The state court considered these mitigating facts (such as evidence that in prison Andrews was "the prey rather than the predator" and acted in self defense), *see In re Andrews*, 52 P.3d at 660–61, and reasonably concluded that the evidence that Andrews was conditioned to violence during his prison experiences was an aggravating, not mitigating, circumstance, *see Burger*, 483 U.S. at 793 (noting that evidence of a petitioner's troubled family background could also "suggest violent tendencies" that could affect the jury adversely). Because the state court reasonably concluded that the jury could have found future dangerousness even had the mitigating evidence been introduced, the state court did not unreasonably apply Supreme Court precedent in weighing how the evidence might impact a jury.

references to Andrews's multiple escapes from prison might have been "inflammatory." *Id*.

Finally, the state court reasonably concluded that the prosecution could have presented its own mental health experts in rebuttal, and could have used the mental health evidence to Andrews's disadvantage on cross examination. *Id.* at 670. The court noted the referee's findings that prosecution experts could have testified that Andrews had normal intelligence and did not suffer brain damage, but had antisocial personality traits.[9] *Id.*; *cf. Pinholster*, 131 S. Ct. at 1396, 1410. Nor was the state court unreasonable in concluding that Andrews's experts' testimony could backfire. For instance, the court noted that the "compelling" testimony from one of Andrews's expert psychiatric witnesses, opining that Andrews's prison experience caused him to react with rage to perceived insults, could cause a jury to conclude that Andrews "was unable to control lethal impulses on the slightest provocation." *In re Andrews*, 52 P.3d at 670; *cf. Pinholster*, 131 S. Ct. at 1410. Finally, the presentation of the mental health evidence would have given the prosecutor additional opportunities to repeat the circumstances of these crimes as well as Andrews's past criminality. *In re Andrews*, 52 P.3d at 670.

---

[9] Andrews argues that the state court unreasonably applied *Eddings*, 455 U.S. at 114–15, in concluding that a diagnosis of antisocial personality disorder is not mitigating. *Eddings* is not on point, because it merely held that a court cannot prevent a jury from hearing such evidence. *Id.* The state court did not unreasonably apply *Eddings*, or any other Supreme Court precedent, by observing that evidence that Andrews had antisocial personality disorder might make him less sympathetic to the jury. *In re Andrews*, 52 P.3d at 670–71.

3

After evaluating the mitigating and aggravating evidence, the state court re-weighed it and assessed whether it was reasonably probable that, in the absence of any deficient performance by counsel, the sentencer "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *see In re Andrews*, 52 P.3d at 671–75. The state court applied the relevant Supreme Court precedent, and concluded that Andrews was not "prejudiced by counsel's rejection of a defense premised on evidence of [Andrews]'s upbringing, the Alabama prison conditions he experienced, and his mental health in light of the circumstances of the crimes, given the ambiguous nature of some mitigating evidence and the substantial potential for damaging rebuttal." *Id.* at 671.

Relying on the Supreme Court's decisions in *Williams* and *Porter*, Andrews argues that the California Supreme Court's decision on the issue of prejudice was an unreasonable application of *Strickland*.[10] In *Williams*, the Supreme Court held that the state court applied the wrong legal standard, 529 U.S. at 395–97, and so applied *Strickland* de novo to the facts of that case, *id.* at 397–98; *see also Pinholster*, 131 S. Ct. at 1410–11. The state court here discussed *Williams* at length and reasonably distinguished it as having "substantially dissimilar facts." *In re Andrews*, 52 P.3d at 675. In *Williams*, for instance, the defense counsel could have introduced strong character evidence, 529 U.S. at

---

[10] While Andrews cites other Supreme Court and Ninth Circuit cases, his argument focuses primarily on *Williams* and *Porter*. Because other cases cited by Andrews are non-binding, not factually analogous, or both, we do not address them here.

398, but no comparable evidence of good character was present in Andrews's case.[11]  The defendant's "nightmarish childhood" in *Williams*, 529 U.S. at 395, 398, was far worse than Andrews's relatively stable family background, *see In re Andrews*, 52 P.3d at 674.  The defendant in *Williams* was "borderline mentally retarded," 529 U.S. at 396, 398 (internal quotation marks omitted), while the prosecution could have presented evidence that Andrews was not mentally impaired, but rather had antisocial personality traits, *In re Andrews*, 52 P.3d at 670.  The only rebuttal evidence in *Williams* was the defendant's three juvenile convictions, 529 U.S. at 396, compared to Andrews's robbery-murder, hostage taking, and history of escape from prison, *In re Andrews*, 52 P.3d at 675.  Finally, the circumstances of the crime in *Williams* were less brutal than Andrews's triple murder, *id.*, because the defendant in *Williams* killed the severely inebriated victim with one blow each to the chest and back after an argument, 529 U.S. at 367–68 & n.1.  Because the facts of *Williams* are dissimilar, the Supreme Court's determination in *Williams* that counsel's ineffective assistance was prejudicial does not make the state court's contrary conclusion here unreasonable. *See Richter*, 562 U.S. at 101–02; *see also Pinholster*, 131 S. Ct. at 1410–11.

Andrews also argues that the state court's decision was unreasonable in light of *Porter*.  Although *Porter* was decided years after the California Supreme Court's opinion in this case, we give it careful consideration, because it provides direction for determining under AEDPA what constitutes an unreasonable application of *Strickland*.  In *Porter*, the

---

[11] Andrews points to evidence that he appeared to adjust well to the Alabama prison system when conditions permitted, but this observation is weaker than the evidence in *Williams*.  *See* 529 U.S. at 396.

Supreme Court faulted the state court for failing to consider all of the mitigating evidence regarding the defendant's family background, military service, and mental health issues. For instance, the state court entirely discounted the effect that evidence of the defendant's brain abnormality and cognitive defects might have on a jury. *See Porter*, 558 U.S. at 42–44. Further, the state court unreasonably discounted mitigating evidence of childhood abuse and the defendant's long record of military service. *Id.* at 43–44. Applying AEDPA, *Porter* held that the state court had unreasonably applied *Strickland* when it held that counsel's failure to introduce this substantial mitigation evidence was not prejudicial. *Id.* at 44.

The state court's determinations in *Porter* are not closely analogous to the state court's determinations in this case. Unlike the state court in *Porter*, the state court here considered all mitigation evidence in the record and did not fail to consider or "discount to irrelevance" significant evidence. *See Porter*, 558 U.S. at 43. The mitigation evidence in *Porter*, including that the defendant served in "horrific" battles of the Korean War, suffered childhood physical abuse, and had a brain abnormality, *see id.* at 41, is less subject to rebuttal than the mitigation evidence in this case, *see In re Andrews*, 52 P.3d at 670–71. Unlike here, where the state's mental health expert disagreed with the defense experts' conclusions and added a diagnosis of antisocial personality disorder, *see id.* at 670, in *Porter*, state experts could not rule out the defense experts' mental health diagnosis, and the state court erred by failing to consider this evidence at all, *see* 558 U.S. at 36, 42–43. Likewise, evidence that the defendant had gone AWOL did not diminish evidence of his military service to "inconsequential proportions," because our nation has a tradition of "according leniency to veterans," and the evidence was "consistent with

[the] theory of mitigation and [did] not impeach or diminish the evidence of his service." *Id.* at 43–44 (internal quotation marks omitted). Here, by contrast, the state court found that Andrews "endured horrifically demeaning and degrading circumstances" in prison before acknowledging this evidence was "double-edged," because it would also bring before the jury Andrews's history of violence both in and out of prison and his escapes, which would be emphasized by their similarity to many of the witnesses who would testify for him. *In re Andrews*, 52 P.3d at 670–71. Further, while the state court here reasonably determined that the prosecution could introduce damaging aggravating evidence, *id.* at 671, 675, in *Porter*, the Supreme Court held that the amount of aggravating evidence would be reduced, because one of the aggravating factors was invalid, 558 U.S. at 42. Because *Porter* is factually distinct from this case, it has little bearing on the question whether the state court unreasonably applied the prejudice prong of *Strickland.*[12]

*Visciotti*, another Supreme Court case that provides direction for determining under AEDPA what constitutes an unreasonable application of *Strickland*, is more closely on point. In *Visciotti*, the Supreme Court considered a state court's rejection of a defendant's *Strickland* claim. 537 U.S. at 26. The state court had weighed the mitigating evidence, including the defendant's brain damage, difficult family

---

[12] Andrews also urges us to apply our recent decision in *Doe v. Ayers*, 782 F.3d 425 (9th Cir. 2015), where we concluded that the defendant was prejudiced by counsel's deficient performance in failing to investigate and present mitigating evidence, including evidence of his rape in prison. *Doe v. Ayers* is not pertinent to our analysis here because it is a pre-AEDPA case that does not examine whether the state court's conclusion was unreasonable. *See id.* at 446, n.31. Nor is *Doe* clearly established law as determined by the Supreme Court. *See* § 2254(d)(1).

background, and possible seizure disorder, against the
aggravating factors, including the circumstances of the crime
(the cold-blooded killing of two victims during a robbery)
and his criminal history of knifing a man and stabbing a
pregnant woman in bed "trying to protect her unborn baby,"
and concluded that the defendant had suffered no prejudice.
*See id.* at 25–26.  After the defendant filed a habeas petition,
the district court granted relief and we affirmed.   We
reasoned that counsel's deficient performance was
prejudicial, because the "aggravating factors were not
overwhelming."    *Id.* at 21–22, 25 (quoting *Visciotti v.
Woodford*, 288 F.3d 1097, 1118 (9th Cir. 2002)).    The
Supreme Court reversed.    It explained that "under
§ 2254(d)(1), it is not enough to convince a federal habeas
court that, in its independent judgment, the state-court
decision applied *Strickland* incorrectly."  *Id.* at 27 (internal
quotation marks omitted).   Rather, "[t]he federal habeas
scheme leaves primary responsibility with the state courts for
these judgments, and authorizes federal-court intervention
only when a state-court decision is objectively unreasonable.
It is not that here."  *Id.*  In sum, the Court held that "[w]hether
or not we would reach the same conclusion as the California
Supreme Court, we think at the very least that the state
court's contrary assessment was not 'unreasonable.'"   *Id.*
(quoting *Bell*, 535 U.S. at 701) (internal quotation marks
omitted).

Here, as in *Visciotti*, the state court reweighed Andrews's
mitigating evidence against the brutal circumstances of the
crime and Andrews's prior criminal history, and determined
there was no reasonable probability that the sentencer would
determine that "the balance of aggravating and mitigating
factors did not warrant imposition of the death penalty."  *Id*.
at 22 (internal quotation marks omitted).  This decision was

not objectively unreasonable, and therefore we are bound to conclude that "[w]hether or not we would reach the same conclusion," we cannot say the California Supreme Court's conclusion was an unreasonable application of *Strickland*. *See id.* at 27.

Because the state court's rejection of Andrews's penalty phase ineffective assistance of counsel claim was not contrary to or an unreasonable application of Supreme Court precedent, we may not grant relief on this claim. § 2254(d)(1). We therefore reverse the district court's contrary conclusion.[13]

## III

Having addressed the state's cross-appeal, we now turn to Andrews's appeal of the district court's dismissal of his sole certified claim (Claim 25) that California's use of its lethal injection protocol to execute him would violate his Eighth Amendment rights. According to the district court, the California lethal injection protocol mirrored the Kentucky lethal injection protocol upheld by the Supreme Court against an Eighth Amendment challenge in *Baze v. Rees*, 553 U.S. 35 (2008). The court reasoned that in light of *Baze*'s ruling, it would be impossible for Andrews to succeed on his challenge to California's lethal injection protocol, and therefore rejected this claim.

---

[13] Because we decide Andrews's claim on prejudice grounds, we need not address the parties' arguments regarding whether counsel's performance was deficient at the penalty phase. *Strickland*, 466 U.S. at 697. We also need not consider the additional aggravating evidence put forth by the state, which Andrews disputes, and therefore deny the state's motion for judicial notice of these additional materials.

At the time the district court ruled in July 2009, California did not have a lethal injection protocol in place. As explained in *Sims v. Dep't of Corrections*, the California Department of Corrections and Rehabilitation (CDCR) has the responsibility for developing a procedure for executions by lethal injection. 216 Cal. App. 4th 1059, 1064 (2013). In December 2006, a federal district court ruled that CDCR's procedure violated the Eighth Amendment prohibition against cruel and unusual punishment. *Id.* (citing *Morales v. Tilton*, 465 F. Supp. 2d 972 (N.D. Cal. 2006)). Although the CDCR substantially revised its protocol in 2007, a state trial court invalidated the revised procedure on the ground that it violated the state's administrative procedure act. *Id.* After losing its appeal, CDCR promulgated a new procedure, which took effect on August 29, 2010. *Id.* at 1064–65. In response to a new legal challenge, a trial court again invalidated the CDCR lethal injection procedure for failure to comply with the state administrative procedure act and permanently enjoined the CDCR from administering executions by lethal injection until it promulgated new regulations. *Id.* at 1066–67. This injunction was upheld on appeal. *Id.* at 1083–84. Andrews's supplemental brief on appeal informed the court that California had no lethal injection protocol in place as of November 12, 2014, and the parties have not informed us of any change since that date. Our research reveals none.[14]

It is premature to rule on the constitutionality of a state's lethal injection protocol if the state does not have one in place. *See Payton v. Cullen*, 658 F.3d 890, 893 (9th Cir.

---

[14] Pursuant to a settlement agreement approved by a state court in June 2015, the CDCR agreed to begin the process of promulgating a new lethal injection protocol. *Winchell v. Beard*, No. 34-2014-80001968 (Cal. Super. Ct. June 3, 2015).

2011). Therefore, the district court erred in entertaining this claim, and we dismiss it as unripe.[15]

IV

Andrews also raises several uncertified claims based on the following legal theories: (1) unconstitutional delay between sentencing and execution under *Lackey v. Texas*, 514 U.S. 1045 (1995) (Stevens, J., statement respecting denial of certiorari); (2) ineffective assistance of counsel under *Strickland*; (3) failure to disclose material exculpatory evidence and false testimony under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264, 269 (1959); and (4) destruction of evidence in violation of due process under *California v. Trombetta*, 467 U.S. 479 (1984), and its progeny. He also raises uncertified claims based on cumulative error and factual innocence.

We first turn to the question whether Andrews must obtain a COA for these claims under 28 U.S.C. § 2253(c).[16]

---

[15] In light of this holding, we need not reach Andrews's claims that the district court erred in denying him an evidentiary hearing on Claim 25 or in declining to stay this claim to allow him to rely on evidence presented in *Morales*.

[16] Section 2253(c) states:

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–
>
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

Our analysis of this question is governed by *Jennings v. Stephens*, which considered whether a habeas petitioner who obtained relief in the district court could defend this judgment on alternate grounds without taking a cross-appeal and obtaining a COA. 135 S. Ct. 793, 798 (2015). *Jennings* held that a habeas petitioner in such circumstances need not take a cross-appeal so long as the petitioner did not attempt to defend the district court's judgment on a theory that seeks "to enlarge his rights or lessen the State's under the District Court's judgment granting habeas relief." *Id.* at 798, 801–02.[17] Further, because "§ 2253(c) applies only when 'an appeal' is 'taken to the court of appeals,'" *id.* at 802 (quoting § 2253(c)), a petitioner who does not have to take a cross-appeal does not need a COA, *id.* Applying this rule, *Jennings* noted that the district court's judgment granting the petitioner relief at the penalty phase of his trial entitled him "to release, resentencing, or commutation, at the State's option." *Id.* at 799. Accordingly, "[a]ny potential claim that would have entitled [the petitioner] to a new sentencing proceeding could

　　　　(B) the final order in a proceeding under section 2255.

　　　　(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

　　　　(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

[17] *Jennings* was nonetheless careful to note that a petitioner defending his judgment on appeal would be "confined to those alternative grounds present *in the record*: he may not simply argue *any* alternative basis, regardless of its origin." *Jennings*, 135 S. Ct. at 800.

have been advanced to 'urge . . . support' of the judgment," *id.* at 800 (last alteration in original) (quoting *United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435 (1924)). Neither a cross-appeal nor a COA would be required. *Id.* at 800–02. By contrast, "[a] habeas applicant who has won resentencing would be required to take a cross-appeal in order to raise a rejected claim that would result in a new trial." *Id.* at 800. And "if a habeas applicant has won retrial below, a claim that his conduct was constitutionally beyond the power of the State to punish would require cross-appeal." *Id.* In both such cases, a COA would also have been required. *See id.* at 802.

Here, Andrews won relief at the district court based on his theory of ineffective assistance of counsel during the penalty phase of his trial. The district court ordered that "the State of California shall, within 120 days from the entry of this Judgment, either grant Petitioner a new penalty phase trial, or vacate the death sentence and resentence the Petitioner in accordance with California law and the United States Constitution." Accordingly, Andrews's rights under this judgment were for a new penalty phase trial or resentencing within a fixed time, and Andrews may urge any potential claim present in the record that would entitle him to a new penalty phase trial or resentencing without taking a cross-appeal or obtaining a COA. *See id.* at 800–02.

But none of Andrews's uncertified claims support the district court's judgment. Five of his claims seek a new guilt phase trial (his *Strickland*, *Brady*/*Napue*, *Trombetta*, and cumulative error claims, and a factual innocence claim).[18] As

---

[18] While the Supreme Court has not ruled on the question whether a free-standing claim of factual innocence is cognizable in habeas, it has suggested that success on such a claim (if cognizable) would entitle a

explained in *Jennings*, because Andrews won resentencing, he must take a cross-appeal and obtain a COA to raise a claim that results in a new trial. *Id.* His *Lackey* claim seeks a ruling that the death penalty cannot be constitutionally imposed on him. Because the district court's order gave the state the right to seek the death penalty at a new penalty phase trial, Andrews's *Lackey* and factual innocence claims seek to "lessen the State's [rights] under the District Court's judgment granting habeas relief." *Id.* at 798. Under *Jennings*, Andrews must bring a cross-appeal and obtain a COA to raise these claims as well.

We lack jurisdiction to consider uncertified claims unless we determine that Andrews "has made a substantial showing of the denial of a constitutional right" and grant a COA. 28 U.S.C. § 2253(c)(2); *see also* Ninth Circuit Rule 22-1(e) ("Uncertified issues raised and designated [in a petitioner's opening brief] will be construed as a motion to expand the COA . . . ."). This standard requires habeas petitioners to make a "showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted). Because the statute is jurisdictional, it does not permit "full consideration of the factual or legal bases adduced in support of the claims"; rather, courts may make only a "threshold inquiry" to determine whether the statutory standard is met. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). As the Supreme Court directed in *Miller-El*, rather than "[d]eciding the substance of

petitioner to a new guilt phase trial. *Herrera v. Collins*, 506 U.S. 390, 403, 405, 417 (1993).

an appeal," *id.* at 342, we "look to the District Court's application of AEDPA to petitioner's constitutional claims," *id.* at 336, in light of a "fair interpretation of the record," *id.* at 345, and ask whether "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *id.* at 338.

## A

We first consider Andrews's claim that his execution would violate the Eighth Amendment due to the long delay between his sentence and execution.  Andrews did not raise this claim in his opening brief on appeal, but moved to file a supplemental brief raising this claim after a district court issued a decision holding that under *Furman v. Georgia*, 408 U.S. 238 (1972) and *Gregg v. Georgia*, 428 U.S. 153 (1976), California's death penalty system violated the Eighth Amendment because its "dysfunctional administration" resulted in "inordinate and unpredictable" periods of delay before execution, such that executions do not serve a retributive or deterrent purpose and will be arbitrary.  *See Jones v. Chappell*, 31 F. Supp. 3d 1050, 1053, 1061–62, 1069 (C.D. Cal. 2014).  We granted his motion, and ordered the state to respond.

In his brief, Andrews stated that he raised this claim to the district court as Claim 26.  In Claim 26, Andrews had argued that executing him after 22 years on death row would be cruel and unusual punishment in violation of the Eighth Amendment and would serve no retributive or deterrent penological purpose.  Claim 26 also asserted that Andrews did not cause any unnecessary delays, but merely sought to vindicate his constitutional rights in a system that produced

delays. Andrews exhausted this claim by raising it to the California Supreme Court, which summarily denied it.

The district court rejected this claim on the merits on the ground that there has been no demonstration of "any support in the American constitutional tradition or in [Supreme Court] precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed," a quote from *Knight v. Florida*, 528 U.S. 990 (1999) (Thomas, J., concurring in a denial of certiorari), relied on by two Ninth Circuit cases, *Smith v. Mahoney*, 611 F.3d 978, 998 (9th Cir. 2010), and *Allen v. Ornoski*, 435 F.3d 946, 958 (9th Cir.2006), as evidence that no Supreme Court precedent supports a claim of unconstitutional delay.

On appeal, Andrews argues that the delay in carrying out the death sentence makes California's death penalty unconstitutional both on its face and as applied to him. After discussing in detail *Jones*'s reasoning and conclusion that the California death penalty system is unconstitutional, Andrews argues that no fairminded jurist could disagree with such a conclusion in his case, because he has been continuously confined under sentence of death for more than 30 years, and the delays are caused by factors outside his control. Andrews also points to separate statements by individual Supreme Court justices questioning the constitutionality of the inherent delay in capital cases. *See, e.g.*, *Muhammad v. Florida*, 134 S. Ct. 894 (2014) (Breyer, J., dissenting from denial of certiorari); *Johnson v. Bredesen*, 558 U.S. 1067 (2009) (Stevens, J., joined by Breyer, J., statement respecting denial of certiorari); *Lackey*, 514 U.S. 1045 (Stevens, J., statement respecting denial of certiorari) (stating that a prisoner's claim

that his 17 years on death row violates the Eighth Amendment's prohibition against cruel and unusual punishment was "not without foundation," and encouraging state and federal courts to consider the issue).

Before we can address this claim, we must consider several procedural hurdles.  As a threshold matter, Andrews did not raise this claim in his opening brief on appeal.  While we generally deem a petitioner to have waived any issue not raised in an opening brief, *see United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992), we recognize exceptions to this general rule.  Such an exception is applicable here: the state has fully briefed the issue and would suffer no prejudice. *See id*.  Therefore, we conclude we may address this issue.

Next, the state argues that Andrews's claim was not fairly presented to the California Supreme Court or the district court, and so is both unexhausted and waived.  "A federal court may not grant habeas relief to a state prisoner unless he has properly exhausted his remedies in state court."  *Dickens v. Ryan*, 740 F.3d 1302, 1317 (9th Cir. 2014) (en banc) (quoting *Peterson v. Lampert*, 319 F.3d 1153, 1155 (9th Cir. 2003) (en banc)).   Exhaustion of constitutional claims requires that the claims be "fairly presented" in state court, allowing the state courts an "opportunity to act on them."  *Id.* at 1318 (alterations and internal quotation marks omitted). To be fairly presented in state court, a claim must include: 1) "a statement of the facts that entitle the petitioner to relief," *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996), and 2) citations "to either a federal or state case involving the legal standard for a federal constitutional violation," *Castillo v. McFadden*, 399 F.3d 993, 999 (9th Cir. 2005).  "A claim has not been fairly presented in state court if new factual allegations either fundamentally alter the legal claim already

considered by the state courts, or place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it." *Dickens*, 740 F.3d at 1318 (citations and internal quotation marks omitted). Two claims are distinct and must be separately exhausted if the claims are based on the same facts, but are supported by distinct constitutional theories. *See Gray*, 518 U.S. at 163–65. "[G]eneral appeals to broad constitutional principles, such as due process, equal protection, and the right to a fair trial, are insufficient to establish exhaustion." *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999). But when claims are "sufficiently related" or "intertwined" so that raising one clearly implies the other, exhausting one claim will also exhaust the related claim, so long as the failure to explicitly raise the related claim was not a "strategic choice." *Lounsbury v. Thompson*, 374 F.3d 785, 788 (9th Cir. 2004) (internal quotation marks omitted) (holding that exhaustion of a procedural challenge to petitioner's competency determination exhausted a substantive challenge to the same determination, though the two challenges relied on two distinct Fifth Amendment theories); *see also Wooten v. Kirkland*, 540 F.3d 1019, 1025 (9th Cir. 2008).

The state asserts that there is a distinction between the sort of Eighth Amendment claim that Andrews raised to the California Supreme Court and in district court (sometimes referred to as a *Lackey* claim), and the Eighth Amendment claim based on *Jones* he is raising here, such that the state courts lacked an opportunity to consider it. Specifically, the state argues that a *Lackey* claim is an individual challenge, based on the theory that executing a prisoner who has spent many years on death row violates the prohibition on cruel and unusual punishment of that prisoner, while *Jones* was based on the theory that the California system itself creates the

constitutional infirmity, because inordinate delay makes the system arbitrary and unable to serve a deterrent or retributive purpose, in violation of the Eighth Amendment.

We disagree. Andrews's claim before the state court, the district court, and on appeal here is essentially the same constitutional claim: that his right to be free from cruel and unusual punishment under the Eighth Amendment is violated by his lengthy incarceration while under a sentence of death. Andrews has not introduced any new facts or evidence since he raised this argument to the state court. Andrews's supplemental brief points to *Jones*'s conclusion that there are systemic delays in imposing the death penalty throughout the California system, but uses this conclusion to support his *Lackey* claim that "inherent delay in capital cases" renders executions unconstitutional. Accordingly, Andrews's references to *Jones* do not "fundamentally alter the legal claim already considered by the state courts." *Dickens*, 740 F.3d at 1318 (internal quotation marks omitted). We therefore conclude that Andrews's uncertified claim, as briefed on appeal, is sufficiently related and intertwined with Claim 26 such that Andrews's exhaustion of Claim 26 likewise exhausted his current challenge. *See Lounsbury*, 374 F.3d at 788. Moreover, Andrews raised this same claim to the district court. Accordingly, Andrews exhausted this delay claim and did not waive it.

We now consider Andrews's motion for a COA for this claim. The district court denied Claim 26 because the state court's rejection of this claim was not an unreasonable application of Supreme Court precedent. No reasonable jurist would find the district court's ruling debatable or wrong. *See Slack*, 529 U.S. at 484. As we have previously stated, no clearly established Supreme Court precedent holds that

inordinate delay in the execution of a capital defendant constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Allen*, 435 F.3d at 958–60. Andrews argues that the state court's rejection of his delay claim is contrary to *Furman*, 408 U.S. at 311–12 (White, J., concurring), and *Gregg*, 428 U.S. at 188 (plurality opinion). But these cases articulate a general Eighth Amendment standard that the death penalty is unconstitutional if imposed arbitrarily, or if the penalty itself does not serve the penological purposes of deterrence and retribution. These principles do not "squarely address[]" the specific issue raised by Andrews's delay claim, and would require a significant extension of the rationale of *Furman* and *Gregg* to apply in this particular context. *See Van Patten*, 552 U.S. at 125–26. Therefore, the state court's rejection of Andrews's delay claim was not an unreasonable application of *Furman* or *Gregg*, and reasonable jurists would not dispute the district court's conclusion to that effect. *See Woodall*, 134 S. Ct. at 1706–07.

Because Andrews has not made a "substantial showing" that his Eighth Amendment rights were violated, *see* 28 U.S.C. § 2253(c)(2), we deny a COA for this claim.

## B

We next turn to Andrews's four uncertified claims alleging that trial counsel were ineffective under *Strickland* for failing to investigate and present four categories of evidence.

The first claim relates to the police's investigation of suspects before Sanders was arrested and agreed to testify pursuant to a plea agreement. During the investigation,

police officers took statements from at least nine witnesses and informally interviewed many others who provided information about activities in and around Wheeler's apartment in the days leading up to the murders. According to these statements, Wheeler's drug customers frequented his apartment, disturbances were a regular occurrence, and shootings had occurred in the apartment. The police did not find any corroborating physical or testimonial evidence suggesting that any of these drug customers was the killer. When investigating Wheeler's apartment, the police found fingerprints of individuals who had been seen in the apartment on the evening the murders occurred, but nothing linking them to the crime. The police arrested one drug dealer who worked with Wheeler, but ultimately released him. When interrogated, this drug dealer denied murdering Wheeler, but told the police that a Mexican Mafia member had told him that the Mexican Mafia had murdered Wheeler. He did not provide any corroborating evidence to support this story.

Relying on this evidence, Andrews claims that his trial counsel were ineffective for failing to investigate and present evidence that third parties, such as Wheeler's customers and fellow dealers, had the motive and opportunity to commit the murders due to their drug-related dealings with Wheeler. The state court summarily rejected this claim when it denied Andrews's second state habeas petition. The district court denied relief on this claim.

We conclude that reasonable jurists would not find debatable or wrong the district court's conclusion that this claim fails under *Strickland* and AEDPA. *See Slack*, 529 U.S. at 484. The evidence adduced at trial was overwhelming: Sanders, an eyewitness, testified to the events

of the murders, Brooks testified regarding Andrews's confession, and the evidence established that Andrews's palm prints were found on either side of Brandon's body. *In re Andrews*, 52 P.3d at 658. Accordingly, reasonable jurists would not debate the reasonableness of the state court's conclusion that counsel's failure to further investigate these suspects did not prejudice Andrews's defense. *See Strickland*, 466 U.S. at 694.

Second, Andrews argues that counsel were ineffective for failing to investigate or present evidence that semen found on Brandon's body could not have come from Andrews. The district court's conclusion that the state court did not unreasonably apply *Strickland* in rejecting this claim is not debatable, because the state court could reasonably conclude that counsel's failure to introduce such evidence was not prejudicial. The record shows only that slides containing semen found on Brandon's body contain biological markers that some people secrete and others do not. Andrews does not secrete these markers, but the record is silent as to whether Brandon was a secretor. Andrews offers statistical evidence suggesting that Brandon was probably not a secretor, but the evidence is not conclusive. Indeed, even other experts testifying for Andrews noted that what minimal evidence they obtained was subject to challenge. In light of the eyewitness testimony about Andrews's involvement in the murders, and his palm prints next to Brandon's body, reasonable jurists would not dispute that the state court reasonably concluded that any deficiency by defense counsel was not prejudicial.

Next, Andrews raises two claims relating to the police investigation of fingerprint evidence found at Wheeler's apartment. As explained by the state court on direct appeal,

two of the police's fingerprint experts, Howard Sanshuck and Donald Keir, testified at trial that they compared 50 fingerprints found in Wheeler's apartment with Andrews's fingerprints and palm prints. *People v. Andrews*, 776 P.2d at 289. The two experts concluded that left and right palm prints on the kitchen floor on either side of Brandon's body belonged to Andrews. *Id*. Sanshuck's supervisor, Jimmy Cassel, had previously reviewed the prints and initially labeled them as belonging to Wheeler. *Id*. Sanshuck discovered the error shortly before Andrews's first trial. At the second trial, Cassel stated that the original misidentification was due to his efforts to process the crime scene information too quickly, and testified that there was no similarity between the palm prints found on the kitchen floor and Wheeler's prints. *Id*. The three experts, Sanshuck, Keir, and Cassel, all testified at the second trial that Andrews's palm prints matched the palm prints found on either side of Brandon's body. *Id*. Andrews has never adduced any evidence to rebut this.

On appeal, Andrews claims that his counsel were deficient in failing to investigate two different lines of defense. First, Andrews claims that counsel performed deficiently by failing to present evidence that Andrews's fingerprints could have been left in Wheeler's apartment due to his prior visits. Second, Andrews claims that counsel should have uncovered and used the police's original misidentification of his palm prints. Andrews points to other reports in the record which he claims shows that Keir and a third analyst, William Leo, also misidentified his fingerprints. The district court rejected this claim. In light of the unrebutted evidence that the palm prints found on either side of Brandon's body were Andrews's prints, no reasonable jurist would dispute the district court's determination that the

state court could reasonably have concluded that counsel's handling of the fingerprint evidence did not prejudice Andrews's defense. *See Strickland*, 466 U.S. at 694.

Finally, Andrews claims that counsel were ineffective for failing to investigate or present evidence regarding his alibi the night of the murder. The record shows that Andrews gave a defense investigator the names of two alibi witnesses and information on how to locate them, but Andrews did not provide any affidavits from these witnesses to the state court, or any further information about the nature of their testimony. The state court and district court rejected this claim. In light of the detailed testimony from Sanders and Brooks, the evidence of Andrews's palm prints on either side of Brandon's body, and the lack of any evidence regarding the alibi witnesses, no reasonable jurist would dispute that the state court reasonably applied *Strickland* in concluding that counsel's failure to further investigate these witnesses was not prejudicial.

Andrews relies on *United States v. Valenzuela–Bernal* for the proposition that he could establish his ineffective assistance of counsel claim without showing how his alibi witnesses would have testified, because he needed only show their testimony would be material and favorable to his defense. 458 U.S. 858, 867 (1982). Therefore, Andrews claims, the state court erred in rejecting his *Strickland* claim. The district court rejected this argument, and we agree. *Valenzuela-Bernal* held that when the government deports aliens who could aid a criminal defendant in his defense, there is no violation of the criminal defendant's right to compulsory process under the Sixth Amendment unless the defendant "make[s] some plausible showing of how [the alibi witness's] testimony would have been both material and

favorable to his defense." *Id.* This ruling does not "squarely address[] the issue," *Van Patten*, 552 U.S. at 125–26, or "establish a legal principle that clearly extends" to the question whether Andrews's counsel's failure to pursue the alibi witnesses was ineffective assistance of counsel, *see Moses*, 555 F.3d at 754 (quoting *Van Patten*, 552 U.S. at 123) (alterations and internal quotation marks omitted). Accordingly, the state court's rejection of Andrews's claim was not an unreasonable application of *Valenzuela-Bernal. See Woodall*, 134 S. Ct. at 1706–07.

In sum, the state court did not unreasonably apply *Strickland* in concluding that Andrews did not create a "substantial, not just conceivable" likelihood of a different result, or that "any real possibility of [Andrews's] being acquitted was eclipsed by the remaining evidence pointing to guilt," *Richter*, 562 U.S. at 112–13; *see also Strickland*, 466 U.S. at 695–96, and the district court's determination to this effect was not debatable. Accordingly, Andrews has not made a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and we decline to issue a COA.

## C

Andrews argues that the state court erred in rejecting two claims that his rights under *Brady* were violated. *Brady* requires the state to disclose "evidence that is both favorable to the accused and material either to guilt or to punishment." *U.S. v. Bagley*, 473 U.S. 667, 674 (1985) (internal quotation marks omitted). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682. Thus, to establish a *Brady* violation, a

defendant must prove: 1) "[t]he evidence at issue [is] favorable to the accused, either because it is exculpatory, or because it is impeaching," 2) the evidence was "suppressed . . . either willfully or inadvertently," and 3) prejudice resulted, meaning there is a reasonable probability that disclosing the evidence to the defense would have changed the result. *See Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *Bagley*, 473 U.S. at 682.

Andrews claims the state suppressed two pieces of evidence. First, he contends that the prosecution failed to disclose a case file maintained by the Los Angeles Police Department, termed a "murder book," which contained material evidence including the third party culpability and fingerprint evidence also advanced in support of his ineffective assistance of counsel claims. The state court could reasonably have rejected this claim because the state had provided counsel with a chronology of the police investigation referring to much of the allegedly suppressed murder book evidence. The district court held the state court's conclusion was not an unreasonable application of *Brady*. No reasonable jurist could disagree with this conclusion, because the state court could reasonably have concluded that the evidence was not suppressed under *Brady*. *See United States v. Dupuy*, 760 F.2d 1492, 1501 n.5 (9th Cir. 1985) (holding the government does not suppress evidence for purposes of *Brady* where "the means of obtaining the exculpatory evidence [was] provided to the defense"). Moreover, the state court could have reasonably concluded that the result of the proceeding would not have been different even if the evidence had been disclosed to the defense. *See Strickler*, 527 U.S. at 280.

For the same reason, no reasonable jurist could disagree with the district court's rejection of Andrews's second *Brady* claim, that the prosecution withheld the fact that Brooks was subject to charges of welfare fraud. The state court could have reasonably concluded that defense counsel had sufficient information to discover that charges had been filed, because defense counsel knew that Brooks was being investigated for welfare fraud, and questioned her about it at trial, outside the presence of the jury. *See Dupuy*, 760 F.2d at 1501 n.5.

Andrews also raises claims under *Napue*, which provides that the state may not "knowingly use false evidence, including false testimony" or "allow[] it to go uncorrected when it appears." 360 U.S. at 269. According to Andrews, the state knowingly adduced false testimony from two fingerprint experts, Keir and Sanshuck. First, Andrews notes that a report in the record, dated August 4, 1980, states that Keir reviewed "fingers" from a suspect named "Walters" (the alias being used by Andrews at the time) and concludes that the prints were "not made." This means, Andrews argues, that Keir lied in identifying the palm prints found by Brandon's body as being from Andrews, and also lied when he testified that he first examined Andrews's palm prints in November 1983. The state asserts Keir did not testify falsely, because the report references fingerprints, while Keir testified regarding palm prints. Second, Andrews argues that Sanshuck's testimony that police policy did not require photographs to be taken of prints on the surface from which they were lifted was false, because it contradicted a Los Angeles Police Department Homicide Manual, dated 1981.[19]

---

[19] The Los Angeles Police Department Homicide Manual states in pertinent part:

The state argues that no false information was knowingly presented, *see id.*, because the homicide manual used permissive, not mandatory, language, and because the manual's statement did not reflect the police department's actual practice, which was the subject of Sanshuck's testimony. The district court rejected Andrews's *Napue* claims, and no reasonable jurist could disagree that the state court could reject these claims based on the reasonable view of the facts offered by the state. *See Taylor v. Maddox*, 366 F.3d 992, 999–1000 (9th Cir. 2004) (holding that under AEDPA, state court fact finding must be not merely wrong, but "actually unreasonable" and without support in the record to warrant habeas relief).

D

Andrews makes three claims based on the fact that between 1993 and 1995, all biological evidence in this case was destroyed, except for 50 fingerprint cards, one vaginal slide, one oral slide, and one anal slide. His petition to the California Supreme Court claimed that the destruction of the evidence violated his due process rights under *Trombetta* and *Arizona v. Youngblood*, a case that held that the government's "failure to preserve potentially useful evidence" before trial does not violate a defendant's due process rights unless the criminal defendant can show that the government acted in bad faith. 488 U.S. 51, 58 (1988). As Andrews acknowledges,

---

Note: (A) Photographing Prints

Prints found at the scene of a homicide should be photographed. The procedure is recommended because it is much easier to introduce print evidence into court if the print has been photographed, as parts of the object which carried the print may show in the picture.

the Supreme Court has since held that cases assessing pre-conviction access to evidence, which would include *Trombetta* and *Youngblood*, do not apply to cases where a defendant is denied access to evidence after being convicted. *See Dist. Attorney's Office for the Third Judicial District v. Osborne*, 557 U.S. 52, 61–62, 68–69, 74 (2009); *see also Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) (observing that "the Supreme Court has not clearly established that post-conviction destruction [of evidence] is a due process violation"). Therefore, the California Supreme Court did not unreasonably apply *Trombetta* or *Youngblood*. Andrews relies on *Osborne* to make a second claim, that the destruction of evidence violated his due process and Eighth Amendment rights. We do not consider whether the state court's decision was contrary to or an unreasonable application of *Osborne*, because it was decided after the California Supreme Court ruled, and thus is not clearly established precedent for purposes of § 2254(d)(1). This theory was not briefed to the district court, as the case was decided between completion of briefing and the court's decision. Andrews points to no clearly established precedent in existence at the time the state court ruled that applies this principle, and therefore the district court's rejection of this claim was not debatable among fair minded jurists.

Andrews's third claim is that the destruction of evidence denied him access to the courts to vindicate an underlying claim of factual innocence. However, as the district court recognized in rejecting this claim, he cites no Supreme Court precedent clearly establishing that destruction of evidence after a defendant is convicted violates a right of access to the courts. *Christopher v. Harbury*, on which Andrews relies, is not on point: it held that a plaintiff's claim that government officials misled her in connection with her husband's

disappearance did not state a constitutional denial of access claim upon which relief could be granted. 536 U.S. 403, 407, 415, 418–19 (2002). Accordingly, no reasonable jurist could dispute that the district court correctly denied this claim.

E

In light of the above, we conclude that no reasonable jurist would disagree with the district court in rejecting Andrews's cumulative error claim. "[T]he fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive,' and thereby had a 'substantial and injurious effect or influence' on the jury's verdict." *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007) (citation omitted) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) and *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). We agree with the district court that the California Supreme Court reasonably determined that any errors, in the aggregate, did not have such a substantial or injurious effect on the verdict. The cumulative result of the disputable errors identified by Andrews would not have made his defense significantly more persuasive, since his defense focused on attacking the credibility of Sanders and Brooks and challenging the fingerprint and palm print evidence. Reasonable jurists would not dispute the district court's conclusion, so no COA is warranted.

Nor would any reasonable jurist disagree with the district court's conclusion that the state court did not err in rejecting Andrews's factual innocence claim. The state court could have reasonably concluded that Andrews's introduction of slides showing that biological markers found in the semen on

Brandon's body had not been secreted by Andrews and may not have been secreted by Brandon, described above, was insufficient to "go beyond demonstrating doubt about his guilt [to] affirmatively prove that he is probably innocent." *See Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (en banc) (observing that the standard for establishing a freestanding claim of actual innocence is "'extraordinarily high,' and that the showing [for a successful claim] would have to be 'truly persuasive.'" (quoting *Herrera*, 506 U.S. at 417) (O'Connor, J., concurring)). This claim does not merit a COA.

In sum, because the district court's conclusions, under AEDPA review, are not debatable among reasonable jurists, Andrews fails to make the "substantial showing of the denial of a constitutional right" required for a COA to issue, and we deny his request for one as to each of his uncertified claims.

V

Andrews contends that the district court erred in denying his motion for an evidentiary hearing on 16 claims (Claims 1–8, 15, 19–23, 25, and 32), which include all but one of the claims on appeal here.[20] We review a district court's denial of an evidentiary hearing for an abuse of discretion, *Sully v. Ayers*, 725 F.3d 1057, 1067 (9th Cir. 2013), and "may affirm the district court's decision on any ground supported by the record, even if it differs from the district court's rationale," *id*. (internal quotation marks omitted). In *Pinholster*, the Supreme Court stated that "review under § 2254(d)(1) is

---

[20] He did not seek an evidentiary hearing on Claim 26, which raised the argument that it would violate the Eighth Amendment to execute him after a long delay.

limited to the record that was before the state court that adjudicated the claim on the merits." 131 S. Ct. at 1398. "[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief." *Sully*, 725 F.3d at 1075; *see Pinholster*, 131 S. Ct. at 1411 n.20 ("Because Pinholster has failed to demonstrate that the adjudication of his claim based on the state-court record resulted in a decision 'contrary to' or 'involv[ing] an unreasonable application' of federal law, a writ of habeas corpus 'shall not be granted' and our analysis is at an end." (alteration in original)). Accordingly, the district court did not err in denying Andrews's motion for an evidentiary hearing.

In light of the foregoing, we REVERSE the district court's grant of relief, DISMISS the Eighth Amendment lethal injection claim as unripe, and DENY the petition for a COA of the uncertified claims.

**REVERSED in part, DISMISSED in part, and PETITION DENIED in part.**